UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

ABRAXAS J. DISCALA,
    also known as "AJ Discala."
IRA SHAPIRO,
CRAIG JOSEPHBERG,
    also known as "Jobo."
KYLEEN CANE,
DARREN GOODRICH,
DARREN OFSINK, and
MICHAEL MORRIS,

    Defendants.

14 Cr. 399 (ENV)

## DECLARATION OF MARANDA E. FRITZ

I, Maranda E. Fritz, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    I am a partner with the law firm of Thompson Hine LLP and represent Michael Morris. I submit this Declaration in support of Mr. Morris's motions for Orders: (1) dismissing counts 1, 2 and 3 of the Superseding Indictment as against him; and (2) severing the trial of Mr. Morris from the trial of Defendant Discala and any other Defendants the Court determines is appropriate.

2.    I have been involved in this matter since the Superseding Indictment against Mr. Morris issued in 2015, and I have conducted an extensive investigation concerning the events that occurred at Halcyon during the period May through September 2013 including a review of the documentation that was available at Halycon and the discovery provided by the Government.

3.    Based on this information, it is my intention as counsel for Mr. Morris to present evidence at trial establishing that Mr. Morris did not conspire with Mr. Discala or Mr. Josephberg but instead were pitted against them as those defendants engaged in conduct that

virtually destroyed the firm that Mr. Morris had spent five years building. That evidence will establish that Mr. Discala, with the assistance of Mr. Josephberg, engaged in a pattern of trading in furtherance of his own scheme to the severe financial detriment of Mr. Morris and his firm, Halcyon Cabot Partners. Among other things, in is my present intention as counsel to establish at trial that:

(a) Mr. Discala was only known to Mr. Morris through Mr. Josephberg;

(b) Mr. Josephberg, on his own, managed Halcyon's relationship with Mr. Discala and handled all of Mr. Discala's trades;

(c) Mr. Discala and Mr. Josephberg acted in concert in devising and carrying out the alleged CodeSmart scheme for their own personal benefit;

(d) Mr. Discala, working with Mr. Josephberg, used Halcyon to further his CodeSmart scheme by running up margin debt and reneging on his obligation to pay those debts in a manner certain to destroy the firm;

(e) In furtherance of that scheme to use, and inflict substantial damage on Halcyon, Mr. Discala engaged in a pattern of false statements to Halcyon to enable him to create various accounts in which to trade Codesmart and to accumulate margin debt; Mr. Discala and Mr. Josephberg then misrepresented to Halcyon their actions to repay that margin debt so as to prolong and even to increase the extent to which they could acquire and hold stock without paying for it;

(f) Mr. Discala's trading activities at Halcyon, including those in furtherance of the CodeSmart scheme, did not result in any profit to Mr. Morris or Halycon; to the contrary, it brought Mr. Morris and Halcyon, to financial ruin and caused Halcyon to suffer losses in excess of $300,000; and

  (g) Mr. Morris did not participate in the CodeSmart scheme devised by Mr. Discala and, by September 2013, had ceased all dealings with Mr. Discala and Mr. Josephberg following the extensive damage caused by Mr. Discala's trading.

4. Additionally, it is my present intention to introduce evidence at trial establishing the antagonistic nature of the relationship between Mr. Morris and Mr. Discala, including evidence that:

  (a) By August 2013, Mr. Discala and his associates had amassed a sizeable margin debt in excess of $750,000 in various accounts at Halcyon, as evidenced by an email chain attached hereto as "Exhibit A";

  (b) After repeated demands by Halcyon and assurances from Mr. Discala, he finally supplied a $700,000 check to cover some of his margin debt, but that check was returned for insufficient funds on August 20, 2013, as evidenced by an email chain attached hereto as "Exhibit B"

  (c) From August 20, 2013 on, none of the accounts at Halcyon relating to Mr. Discala were permitted to engage in trading other than liquidations, and Mr. Josephberg was instructed by Halcyon to cease trading on behalf of Mr. Discala and his associates, as evidenced by email chains attached hereto as "Exhibit C" and "Exhibit D";

  (d) In a private transaction, Mr. Morris paid $50,000 for 62,500 shares of CodeSmart (slightly less than $1 per share); separately, Mr. Discala entered into a "put" agreement with Mr. Morris to purchase that CodeSmart stock by September 1, 2013, for $100,000; as of that date in September, the stock was trading at over $4.00 a share, and the stock acquired by Mr. Morris would have had a value exceeding $400,000; nonetheless, Mr. Discala enforced that agreement with Mr. Morris and took the stock for

a total of $100,000.00, as evidenced by the document attached hereto as "Exhibit E;"

(e) During the same time period, Mr. Morris' son engaged in sales of Codesmart stock to the fullest extent permitted by an applicable "leak out" agreement notwithstanding Mr. Discala's insistence that the stock should be held and his anger regarding the sales.

5. Attached hereto as "Exhibit F" is a copy of the article *Conversion to New Government Codes for Healthcare Providers Could Spark More Confusion*, in Forbes, dated June 25, 2013.

Dated: September 15, 2017
      New York, New York

                                     /s/ Maranda E. Fritz
                                     Maranda E. Fritz