JMK:SCJ/PTH/MEB
F. # 2013R01203

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

ABRAXIS J. DISCALA,
    also known as "AJ Discala,"
CRAIG JOSEPHBERG,
    also known as "Jobo,"
KYLEEN CANE and
MICHAEL MORRIS,

             Defendants.

– – – – – – – – – – – – – – – – – –X

Docket No. <u>14-CR-399 (S-1)(ENV)</u>

<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, TO SEVER, FOR A JURY QUESTIONNAIRE AND TO SUPPRESS EVIDENCE OBTAINED PURSUANT TO A WIRETAP AND A SEARCH WARRANT</u>

BRIDGET M. ROHDE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Shannon C. Jones
Patrick T. Hein
Mark E. Bini
Assistant U.S. Attorneys
  (Of Counsel)

TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     BACKGROUND ........................................................................................... 1

        A.      The Government's Case...................................................................... 1

        B.      The Defendants and Key Entities ....................................................... 3

        C.      The Fraudulent Market Manipulation Schemes................................... 5

                1.      The CodeSmart Manipulation Scheme ..................................... 5

                2.      The Cubed Manipulation Scheme.............................................. 7

                3.      The StarStream and Staffing Group Manipulation Schemes...................... 9

III.    THE COURT SHOULD DENY MORRIS'S MOTION TO DISMISS FOR LACK OF VENUE ............................................................................................... 10

        A.      Legal Standard ................................................................................. 10

        B.      Venue Is Sufficiently Alleged........................................................... 11

IV.     THE COURT SHOULD DENY CANE'S MOTION TO DISMISS ON DUPLICITY GROUNDS .............................................................................. 13

        A.      Legal Standard ................................................................................. 14

        B.      Application....................................................................................... 18

                1.      Counts One and Two Each Properly Charged Single Conspiracies And Are Not Duplicitous.................................................................. 18

                2.      Count Four Properly Charges a Securities Fraud Scheme and Is Not Duplicitous ................................................................................ 20

V.      THE COURT SHOULD DENY MORRIS AND CANE'S MOTIONS TO SEVER ...... 21

        A.      Legal Standard ................................................................................. 21

        B.      Morris and Cane Were Properly Joined in the Superseding Indictment.............. 24

        C.      There is No Unfair Prejudice in Trying the Defendants Together........................ 25

                1.      The Trials Should Not Be Severed Due to Antagonistic Defenses .......... 28

        2.      The Trials Should Not Be Severed Due to Disparity of Evidence ........... 32

VI.    THE COURT SHOULD DENY CANE'S MOTION FOR A JURY
QUESTIONAIRRE ................................................................................................. 34

    A.    Legal Standard ................................................................................. 34

    B.    Application ........................................................................................ 35

VII.   THE COURT SHOULD DENY DISCALA'S MOTION TO SUPPRESS THE
WIRETAP WITHOUT A HEARING ................................................................. 35

    A.    The Wiretap Affidavit ..................................................................... 35

          1.      The CodeSmart Manipulation Scheme .................................... 37

          2.      The Cubed Manipulation Scheme ............................................ 37

    B.    The Court Should Deny Discala's Motion for a *Franks* Hearing ......................... 38

          1.      The *Franks* Doctrine ................................................................. 39

          2.      Discala's Allegations that Special Agent Braconi Made Intentional or
Reckless Misstatements and Omissions Are Meritless ............................ 41

                  a.      Special Agent Braconi's Discussion of Reverse Mergers Was
Accurate and Complete ................................................................. 42

                  b.      Special Agent Braconi Did Not Intentionally or Recklessly
Misstate or Omit Any Material Information From His Discussion
of CodeSmart's False Statements ................................................. 44

                  c.      Special Agent Braconi's Analysis of the Price Fluctuations in
CodeSmart's Share Price Was Accurate And Reasonable ........... 49

                  d.      Special Agent Braconi Reviewed and Accurately Described
Discala's Trading Records ............................................................ 50

                  e.      Special Agent Braconi's Description of Cubed's Reporting
Requirements Regarding Its Asset Purchase Agreement Was
Accurate ........................................................................................ 53

                  f.      Special Agent Braconi's Statements Regarding the Valuation of
Crackpot Intellectual Property Were Accurate and Well-Founded
....................................................................................................... 55

    C.    The Court Should Deny Discala's Motion to Suppress the Wiretap for Lack of
Necessity Without a Hearing ................................................................. 56

|   | 1. | Title III's "Necessity Requirement" | 57 |
|   | 2. | The Wiretap Affidavit Exceeds Title III's "Necessity Requirement" | 59 |
| D. | The Court Should Deny Discala's Motion to Suppress the Wiretap for Violating Minimization Requirements Without a Hearing | | 63 |
|   | 1. | Title III's "Minimization Requirement" | 63 |
|   | 2. | The FBI Agents Monitoring the Wiretap Complied with Title III's Minimization Requirements | 65 |

VIII.   THE COURT SHOULD DENY DEFENDANT DISCALA'S MOTION TO SUPPRESS THE FRUITS OF THE OMNIVIEW SEARCH WITHOUT A HEARING .................... 69

| A. | The Search of OmniView and Arrests | 70 |
| B. | The OmniView Affidavit | 72 |
| C. | The OmniView Search Warrant Is Legally Sound | 73 |
| D. | Legal Standard for Search Warrants | 74 |
|   | 1. | Probable Cause | 74 |
|   | 2. | Particularity and Breadth | 75 |
|   | 3. | Good Faith Exception to Suppression | 77 |
| E. | There is No Merit to Discala's Motion to Suppress the Fruits of the OmniView Search | | 79 |
|   | 1. | The OmniView Affidavit Was Not Misleading and no *Franks* Hearing is Merited | 79 |
|   |   | a. | Press Releases and SEC Filings | 79 |
|   |   | b. | Concealment of Ownership Interests | 83 |
|   |   | c. | Trading Losses | 85 |
|   |   | d. | Coordination with Bell and Josephberg | 85 |
|   |   | e. | Connection to the OmniView Premises | 87 |
|   | 2. | The OmniView Warrant Satisfies the Particularity Requirement | 88 |
|   | 3. | The Good Faith Exception | 89 |

iii

## I.  **PRELIMINARY STATEMENT**

The government submits this memorandum in response to: (1) the defendant Michael Morris's motion to dismiss Counts One, Two and Three of the Superseding Indictment for lack of venue; (2) the defendant Kyleen Cane's motion to dismiss Counts One, Two and Four of the Superseding Indictment as duplicitous; (3) Morris and Cane's motions to sever their respective trials from that of their co-defendants; (4) Cane's motion for a jury questionnaire; (5) the defendant Abraxas J. Discala's motion to suppress evidence obtained pursuant to a wiretap of Discala's cellular telephone; and (6) Discala's motion to suppress the fruits of the search warrant of Discala's company, OmniView Capital Advisors LLC ("OmniView").  (ECF Nos. 341, 342, 345, 349, 350, 352, 353, 363).

For the reasons set forth below, the defendants' motions are without merit and should be denied in their entirety without a hearing.

## II.  **BACKGROUND**

### A.  The Government's Case

The government's case against Abraxas J. Discala, Craig Josephberg, Kyleen Cane and Michael Morris (the "Defendants") arises out of the Federal Bureau of Investigation's ("FBI") investigation into a scheme to manipulate trading in four microcap stocks between approximately October 2012 and July 2014: (1) CodeSmart Holdings, Inc. ("CodeSmart"); (2) Cubed, Inc. ("Cubed"); (3) StarStream Entertainment ("StarStream"); and (4) The Staffing Group, Ltd. ("Staffing Group") (collectively, the "Manipulated Public Companies").

On July 15, 2014, a federal grand jury sitting in the Eastern District of New York returned an indictment charging the following seven individuals with conspiracy to commit securities fraud, conspiracy to commit mail and wire fraud and related charges: Discala,

Josephberg, Cane, Marc Wexler, Ira Shapiro, Matthew Bell and Victor Azrak (the "Indictment").

(ECF No. 1).

On November 2, 2015, a grand jury returned a superseding indictment, which

added three additional defendants, Morris, Darren Goodrich and Darren Ofsink; additional

factual allegations; and an additional wire fraud count (the "Superseding Indictment" or "S-1

Ind.").[1]  (ECF No. 166).  Specifically, Counts One and Two of the Superseding Indictment

charged Discala, Shapiro, Josephberg, Cane, Goodrich, Ofsink, Cane and Morris with conspiracy

to commit securities fraud, in violation of 18 U.S.C. § 371, and conspiracy to commit mail and

wire fraud, in violation of 18 U.S.C. § 1349, in connection with defrauding investors and

potential investors in the Manipulated Public Companies.  Count Three of the Superseding

Indictment charged Discala, Shapiro, Josephberg, Ofsink and Morris with securities fraud, in

violation of 15 U.S.C. §§ 78j(b) and 78ff, in connection with the stock of CodeSmart.  Count

Four of the Superseding Indictment charged Discala, Josephberg, Cane and Goodrich with

securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, in connection with the stock of

Cubed.  Counts Five through Eleven of the Superseding Indictment charged wire fraud, in

violation of 18 U.S.C. § 1343, in connection with certain communications regarding the

Manipulated Public Companies; Discala was charged in all these counts, Goodrich was charged

in Count Six and Josephberg was charged in Count Ten.

As alleged in the Superseding Indictment, between approximately October 2012

and July 2014, the Defendants engaged in a scheme to defraud investors and potential investors

in the Manipulated Public Companies by: (1) issuing false and misleading press releases; (2)

---

[1] The Superseding Indictment did not charge Wexler, Bell, or Azrak, who had already
pleaded guilty to charges related to the Indictment.

making false and misleading SEC filings; (3) fraudulently concealing the defendants' and their

co-conspirators' beneficial ownership of stock; (4) engineering price movements and trading

volume in the stocks; and (5) making unauthorized purchases of the stock in accounts of

unwitting investors.  (S-1 Ind. ¶ 18).

Since the return of the Superseding Indictment, Goodrich, Shapiro and Ofsink

have pleaded guilty pursuant to plea agreements.  Trial for the remaining four defendants –

Discala, Josephberg, Cane and Morris – is scheduled to begin on January 22, 2018.

B.      The Defendants and Key Entities

Discala was the Chief Executive Officer of OmniView.  (S-1 Ind. ¶ 1).

OmniView held its principal place of business in Connecticut, had an office in New York, New

York, and marketed itself as a merchant bank.  (Id. ¶ 2).  OmniView claimed, among other

things, to possess a team of seasoned professionals with experience in raising capital for

companies through private placements, alternative public offerings and reverse takeovers of

companies whose shares were traded on the Over-the-Counter ("OTC") markets.  (Id.).  Discala

also controlled The Broadsmoore Group LLC ("Broadsmoore") and Fidelis Holdings, LLC

("Fidelis").  (Id. ¶ 1).

Morris was a Managing Director of Halcyon Cabot Partners, Ltd. ("Halcyon"), a

broker-dealer registered with the United States Securities and Exchange Commission ("SEC")

and the Financial Industry Regulatory Authority ("FINRA").  (S-1 Ind. ¶ 8).  Morris also served

for a period of time as the Chief Compliance Officer of Halycon.  (Id.).

Josephberg was a registered broker.  (S-1 Ind. ¶ 4).  In or about and between

November 2010 and October 2013, Josephberg was employed as a broker by Halcyon.  (Id.).  In

or about and between October 2013 and June 2014, Josephberg was employed as a broker at

another broker-dealer registered with the SEC and FINRA ("BD Firm 1").  (Id.).  Josephberg

also controlled Garper LLC ("Garper").  (Id.).

       The defendant Kyleen Cane was an attorney and the managing partner of the law

firm Cane Clark LLP ("Cane Clark").  (S-1 Ind. ¶ 5).  Cane Clark purportedly specialized in

providing corporate and securities fraud legal services to public companies with small

capitalizations.  (Id.).

       CodeSmart, formerly known as First Independence, was a Florida corporation

with its principal place of business in New York, New York.  (S-1 Ind. ¶ 9).  CodeSmart's

purported business plan consisted of furnishing the healthcare industry with educated, trained

and qualified medical billing coders.  (Id.).  CodeSmart offered "CodeSmart University" as "an

online program of study for existing coders, new coders, clinicians and healthcare roles of all

types."  (Id.).  CodeSmart traded under the ticker symbol ITEN.  (Id.).

       Cubed, formerly a mining exploration company known as Northwest Resources,

Inc. ("Northwest"), was a Nevada corporation with its principal place of business in Las Vegas,

Nevada.  (S-1 Ind. ¶ 10).  Cubed's purported business plan involved the "Get CUBED" mobile-

first platform, which Cubed claimed was "a cloud-based, three-dimensional functional cube that

appears on the screens of mobile device owners, allowing developers and users to present

complex and contextual concepts in a clear and simple manner."  (Id.).  Cubed traded under the

ticker symbol CRPT.  (Id.).

       StarStream, formerly known as Gelia Group, Corp., was a Nevada corporation

with its principal place of business in Monterey, California.  (S-1 Ind. ¶ 11).  StarStream's

purported business plan consisted of producing, promoting, supporting and developing motion

pictures and funding motion picture entities, and the company traded under the ticker symbol SSET. (Id.).

Staffing Group, formerly known as Aviana, Corp., was a Nevada corporation with its principal place of business in New Orleans, Louisiana. (S-1 Ind. ¶ 12). Staffing Group's purported business plan consisted of recruiting, hiring, employing and managing skilled workers for its clients. (Id.). Staffing Group traded under the ticker symbol TSGL. (Id.).

C.      The Fraudulent Market Manipulation Schemes

1.      The CodeSmart Manipulation Scheme

In April 2012, First Independence, a shell public company, filed a Form S-1 with the SEC to register an offering of 3,000,000 shares of its stock, which was made effective on August 7, 2012. (S-1 Ind. ¶ 19). In or about January 2013, despite projecting an extremely pessimistic outlook in prior SEC filings, First Independence sold its entire lot of 3,000,000 shares to twenty-four shareholders, based primarily in Florida, for $0.0115 per share, raising $34,500 for the company. (Id.). The 3,000,000 shares were registered with First Independence's transfer agent on February 7, 2013. (Id.). The Form S-1 did not authorize any subsequent distribution of those shares to others or to the general public. (Id.). From February 2013 through April 2013, there was no public trading of First Independence's stock. (Id. ¶ 20). On or about May 3, 2013, CodeSmart, a private company, was acquired by First Independence in a reverse merger. (Id.). Following the reverse merger, the new company operated under the CodeSmart name. (Id.).

In or about May 2013, Discala, Josephberg and Morris, with others, purchased the 3,000,000 purportedly unrestricted shares of CodeSmart at $0.023 per share from the aforementioned twenty-four shareholders. (S-1 Ind. ¶ 21). Ofsink, an attorney who also

5

received 125,000 shares, received the new stock certificates and enabled the co-conspirators to conceal their beneficial ownership interest in the 3,000,000 shares by distributing the shares across a number of co-conspirators and by placing them in nominee accounts designed to conceal the true beneficial owners of the shares.  (Id.).  On June 14, 2013, CodeSmart implemented a 2-for-1 forward stock split of its common stock, which caused the 3,000,000 shares controlled by Discala and his co-conspirators to double to 6,000,000 shares.  (Id.).

After gaining control of CodeSmart's unrestricted shares, Discala, Wexler, Shapiro, Bell, Josephberg, Ofsink, and Morris (collectively, the "CodeSmart Co-Conspirators"), engaged in manipulative trading, which included two separate pumps and dumps.  (S-1 Ind. ¶ 22).  The first pump and dump occurred between approximately May 13, 2013 and August 21, 2013.  (Id.).  During this first period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $1.77 to a high of $6.94 on July 12, 2013, before causing it to drop to $2.19 on August 21, 2013.  (Id.).  The second pump and dump occurred between approximately August 21, 2013 and September 20, 2013.  (Id.).  During this second period, the CodeSmart Co-Conspirators manipulated CodeSmart's stock price by raising it from $2.19 to a high of $4.60 on August 30, 2013, before causing it drop to $2.13 on September 20, 2013.  (Id.).

For example, on August 21, 2013, in order to reap profits from CodeSmart stock during the second pump and dump, the CodeSmart Co-Conspirators sold approximately 140,000 shares from a trading account at Halcyon that was controlled by Discala but held in the name of his administrative assistant.  (S-1 Ind. ¶ 27).  Because there was no genuine market demand to purchase 140,000 CodeSmart shares at this time, Discala directed Josephberg, Morris and other co-conspirators to purchase the CodeSmart shares.  (Id.).  Approximately half of the 140,000 CodeSmart shares sold that day were purchased by Josephberg, using the Garper account that he

6

controlled; by Morris, using his account at Halcyon, the broker-dealer at which he was a Managing Director; and by other co-conspirators and individuals affiliated with the co-conspirators.  (Id.).

The CodeSmart Co-Conspirators timed their trading activity in coordination with the issuance of company press releases, a number of which contained false and misleading information.  (S-1 Ind. ¶ 24).  These press releases, which touted agreements between CodeSmart and various universities and learning institutions, were issued at an accelerated rate in an effort to generate market interest in the stock.  (Id.).

The CodeSmart Co-Conspirators profited by selling CodeSmart stock, issued to them at pennies per share, to clients of Josephberg and Bell, sometimes without the customers' and clients' knowledge and consent and without Josephberg and Bell providing them with required disclosures.  (S-1 Ind. ¶ 28).  In or about and between May 2013 and October 2013, Halcyon's customers purchased approximately 130,000 shares of CodeSmart.  (Id. ¶ 29).  During this same period, Josephberg sold approximately 86,000 shares of CodeSmart stock in Garper's brokerage accounts and Morris sold approximately 62,500 shares of CodeSmart stock in his son's brokerage accounts.  (Id.).

2.      The Cubed Manipulation Scheme

On March 6, 2014, Northwest, a public shell company with only nominal assets and no revenues, appointed John Doe 1, the President and Chief Operating Officer of Crackpot, Inc. ("Crackpot"), a private company, as its sole officer and director.  (S-1 Ind. ¶ 33).  A week later, on March 14, 2014, Northwest filed with the SEC a Form 8-K explaining that Northwest had changed its name to Cubed.  (Id.).

On March 24, 2014, Cubed filed with the SEC a Form 8-K stating that it had entered into an intellectual property purchase agreement (the "Asset Purchase Agreement") with

Crackpot pursuant to which it acquired intellectual property, specifically a "mobile-first platform," from Crackpot. (S-1 Ind. ¶ 34). In exchange for this intellectual property, Cubed agreed to pay Crackpot $350,000 and 2,537,455 restricted shares of Cubed. (Id.). Cubed had no assets and was a penny stock at the time of the Asset Purchase Agreement. (Id.). Through this Asset Purchase Agreement, Crackpot, a private company, effectively became Cubed, a public company. (Id.). On March 26, 2014, Cubed's board of directors appointed John Doe 2, the original founder of Crackpot, as the new Chief Executive Officer and President, replacing John Doe 1. (Id.).

On March 28, 2014, 200 shares of Cubed were sold at $5.00 per share. (S-1 Ind. ¶ 35). Based on the $5.00 share price and its outstanding common stock, Cubed had a market capitalization of approximately $150 million. (Id.). On April 22, 2014, after 15 days of no trading activity, Cubed's stock began trading in earnest at a price of $5.25 per share; the stock closed that day at $5.20 per share. (Id.).

On or about and between April 22, 2014 and April 30, 2014, Discala, Wexler, Bell, Josephberg, Cane, Azrak and Goodrich, with others (collectively, the "Cubed Co-Conspirators"), were responsible for manipulating the vast majority of the trading activity in Cubed through, inter alia, wash trades and matched trades. (S-1 Ind. ¶ 36). Specifically, the Cubed Co-Conspirators purchased more than 50% of the total number of Cubed shares purchased during this period. (Id.). The Cubed Co-Conspirators used BD Firm 1, where Josephberg was then employed, and a broker-dealer where Goodrich was employed, among other firms, to execute these fraudulent trades. (Id.).

On or about and between May 2, 2014 and June 29, 2014, law enforcement authorities conducted a judicially-authorized wiretap of Discala's cellular telephone (the

"Discala Wiretap").  (S-1 Ind. ¶ 37).  The Discala Wiretap revealed that the Cubed Co-Conspirators used wash trades and matched trades to manipulate Cubed's stock price and volume.  (Id.).  Specific intercepted calls relating to the scheme are described in paragraphs 39, 41, 53(e)-(n) and 60 of the Superseding Indictment.  Rather than generating significant market interest and causing a quick pump and dump that would invite regulators' scrutiny, the Cubed Co-Conspirators engaged in a scheme that gradually increased the price of Cubed's stock to provide the appearance of a legitimate company with genuine and steady market demand for the security.  (Id. ¶ 38).

To successfully execute their fraudulent scheme of causing a controlled rise of Cubed's stock, the Cubed Co-Conspirators used escrow accounts that were maintained by Cane to manipulate the price and trading volume of Cubed's stock.  (S-1 Ind. ¶ 39).

On July 9, 2014, Cubed's stock price closed at $6.60 per share and remained in the controlled pump phase of the fraudulent manipulation scheme orchestrated by the Cubed Co-Conspirators when trading was halted by the SEC.  (S-1 Ind. ¶ 42).

3.      The StarStream and Staffing Group Manipulation Schemes

In or about and between October 2013 and July 2014, the defendants Discala, Wexler, Bell and Josephberg, together with others, agreed to fraudulently manipulate StarStream's and Staffing Group's stocks by artificially controlling the price and trading volume of StarStream's and Staffing Group's stocks through, inter alia, wash trades and match trades. (S-1 Ind. ¶ 43, 44).  Specific examples of texts relating to these schemes are described in paragraphs 43 to 48 and 60 of the Superseding Indictment.

9

**ARGUMENT**

III.   **THE COURT SHOULD DENY MORRIS'S MOTION TO DISMISS FOR** <u>**LACK OF VENUE**</u>

Morris moves to dismiss Count One (conspiracy to commit securities fraud as to the Manipulated Public Companies), Count Two (conspiracy to commit mail and wire fraud as to the Manipulated Public Companies) and Count Three (securities fraud as to CodeSmart) of the Superseding Indictment based on purportedly improper venue.  (Morris Mem. at 10-11).  As set forth below, this motion is without merit and should be denied.

A.   <u>Legal Standard</u>

"Both the Sixth Amendment and Federal Rule of Criminal Procedure 18 require that defendants be tried in the district where their crime was 'committed.' " <u>United States v. Ramirez</u>, 420 F.3d 134, 138 (2d Cir. 2005) (citing U.S. Const. amend. IV, and Fed. R. Crim. P. 18).  Title 18, United States Code, Section 3237(a) states: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  Furthermore, "[b]ecause venue is not an element of a crime, the government need establish it only by a preponderance of the evidence at trial."  <u>United States v. Smith</u>, 198 F.3d 377, 384 (2d Cir. 1999).  When faced with a pre-trial venue challenge, the government need only show that the superseding indictment alleges facts sufficient to support venue.  <u>United States v. Bronson</u>, No. 05–CR–714 (NGG), 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007).

In a conspiracy prosecution, venue is proper in any district in which "an overt act in furtherance of the conspiracy was committed."  <u>United States v. Naranjo</u>, 14 F.3d 145, 147 (2d Cir. 1994).  This includes not just acts by co-conspirators but also acts that the conspirators

10

caused others to take that materially furthered the ends of the conspiracy.  See United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) (stating that venue is proper in a district where the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur).  With respect to the securities fraud charged in Count Three, the venue provision of the Securities Exchange Act of 1934 provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa.  In Svoboda, the Second Circuit concluded that the execution of trades on the stock exchanges located in Manhattan was sufficient to establish venue in the Southern District of New York for securities fraud charges where the defendant either knew, or could reasonably foresee, that his trades would be executed on those exchanges.

      B.      Venue Is Sufficiently Alleged

Here, Counts One through Three each allege generally that the charged crime occurred "within the Eastern District of New York and elsewhere."  At the motion to dismiss stage, such an allegation suffices to allege venue in the Eastern District of New York.  See United States v. Stein, 429 F. Supp. 2d 633, 643 (S.D.N.Y. 2006) ("as long as the indictment alleges venue, a pretrial motion to dismiss based on contrary allegations by the defendant must be denied."); United States v. Bellomo, 263 F. Supp. 2d 561, 579 (E.D.N.Y. 2003) (same).  Morris has failed to cite any case in which a court has dismissed a charge for lack of venue prior to trial where, as here, there was a specific allegation in the indictment that the offenses took place within the district where the prosecution was brought.

As set forth in the Indictment and Superseding Indictment, several of the indicted co-conspirators live in the Eastern District of New York, including Morris, Ofsink and Azrak. While residence alone does not establish venue for the charged crimes, this is not a case in which

the district of prosecution is far removed from the scheme participants.  In fact, several individuals took steps in this district to further the scheme.  Discala, for example, as alleged in Counts Five through Eleven, made telephone calls either to or from the Eastern District of New York in furtherance of the Cubed and StarStream schemes, which comprises part of the securities fraud conspiracy charged in Count One and the wire fraud conspiracy charged in Count Two. With regard to Count Three, the CodeSmart securities fraud charge, the government will present evidence at trial to show at least one $34,000 wire in early September 2013 was sent from Discala in Manhattan to a co-conspirator who lived in Staten Island; the co-conspirator in turn wired $34,000 from a Staten Island bank branch to pay for trades Discala conducted through Halcyon.  Also, control of the CodeSmart stock was facilitated by a coordinated purchase of all the free-trading stock from the public shell stock holders in May 2013 by a group of individuals organized by Discala, including Morris.  (S-1 Ind. ¶ 21).  The government will present evidence at trial to show that, on or about May 3, 2013, at least one  "lock up agreement" relating to the purchase of these CodeSmart shares were emailed from a business in Staten Island to Discala's assistant at OmniView, who then forwarded the agreement to Discala and Ofsink.

Additionally, the government expects to present evidence at trial to show that: (1) dozens of Brooklyn-based accounts traded CodeSmart shares; and (2) electronic trading information relating to shares of both CodeSmart and Cubed, included the CodeSmart shares owned by Morris, were routed to a Depository Trust & Clearing Corporation ("DTCC") data center located in Brooklyn.  Morris, both as a sophisticated investor and the Managing Director of Halcyon, a registered broker-dealer, would have been well aware of the role of the DTCC in securities trading.

12

In sum, there are multiple ways in which the government expects to prove venue for the charges in the Superseding Indictment, including Counts One, Two and Three.  The government has properly alleged venue in the Superseding Indictment, and any venue challenge is premature prior to the conclusion of the presentation of evidence at trial.

## IV.    THE COURT SHOULD DENY CANE'S MOTION TO DISMISS ON DUPLICITY GROUNDS

Cane seeks to dismiss on duplicity grounds Count One (conspiracy to commit securities fraud as to the Manipulated Public Companies), Count Two (conspiracy to commit mail and wire fraud as to the Manipulated Public Companies) and Count Four (securities fraud as to Cubed) of the Superseding Indictment.  (Cane Mem. at 10-13).  Specifically, Cane argues that Counts One and Two are duplicitous because, Cane claims, they impermissibly "allege four different conspiracies under the umbrella of a single count."  (Id. at 10).  Morris also argues that the indictment improperly charges "two separate distinct crimes, one involving Morris and CodeSmart, and one not."  (Morris Mem. at 12).  With respect to Count Four, Cane moves to dismiss it as duplicitous because, she alleges, the unit of prosecution for a securities fraud charge is a single securities transaction, and the government's count charges Cane with multiple securities transactions in a single count.  (Id. at 13).

With respect to Counts One and Two, for the reasons explained below, Morris and Cane joined a single conspiracy led by Discala to manipulate the stocks of the Manipulated Public Companies.  With respect to Count Four, it is well settled that a securities fraud count may charge liability for a period of time, and is not confined to a single securities transaction. Accordingly, Cane's motion is without merit.

13

A.    Legal Standard

Motions to dismiss indictments must satisfy a high standard and are disfavored. See United States v. Bustos de la Pava, 268 F.3d 157, 165 (2d Cir. 2001) ("[D]ismissal of an indictment is an extraordinary remedy reserved for extremely limited circumstances implicating fundamental rights.") (citation and internal quotation marks omitted); see also United States v. Kerik, 615 F. Supp. 2d 256, 262 (S.D.N.Y. 2009) ("A defendant seeking to dismiss counts under Rule 12 must satisfy a high standard") (citation and internal quotation marks omitted); United States v. Brooks, No. 06-CR-550 (JS), 2009 WL 3644122, at *2 (E.D.N.Y. Oct. 27, 2009) (same).

On a pre-trial motion to dismiss, the court must accept all factual allegations in the indictment as true and "the sufficiency of the evidence is not appropriately addressed on a pre-trial motion to dismiss an indictment."  Alfonso, 143 F.3d at 776-77; see also United States v. Yakou, 428 F.3d 241, 246 (D.C. Cir. 2005) ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context").

With respect to duplicity, an indictment is "impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby."  United States v. Sturdivant, 244 F.3d 71, 75 (2d Cir. 2001) (quoting United States v. Murray, 618 F.2d 892, 896 (2d Cir.1980)).  Courts have described the policy considerations underlying avoiding a duplicitous indictment to include: (1) a general guilty verdict will not reveal if the jury found the defendant guilty of only one crime and not the other, or guilty of both; (2) a guilty verdict does not indicate whether the jury found the defendant guilty without having reached an unanimous verdict on the commission of a particular offense; (3) inadequate notice to the defendant of the charges against him; (4) interference with appropriate sentencing;

14

and (5) protecting the defendant against double jeopardy in a subsequent prosecution.  See
Murray, 618 F.2d at 896; see also United States v. Helmsley, 941 F.2d 71, 91 (2d Cir. 1991).

      The remedy for a duplicitous indictment before trial is reformulation rather than
dismissal.  See United States v. Barrett, No. 10-CR-809 (KAM), 2011 WL 6780901, at *2-5
(E.D.N.Y. Nov. 27, 2011).  The government may elect to proceed on one of the charged crimes,
and redact the indictment accordingly, or the court may remove the potential prejudice through a
curative jury instruction.  See Helmsley, 941 F.2d at 91 ("any possibility of a duplicitous verdict
was removed by [the Judge's] careful charge"); United States v. Droms, 566 F.2d 361, 363 n.1
(2d Cir. 1977).  After trial, "a court can avoid prejudice to the defendant by sentencing him based
upon a conviction for only one offense . . . as long as that one offense does not carry a higher
penalty than the other."  Sturdivant, 244 F.3d at 80.

      Further, a count is not duplicitous if it charges a single crime committed by more
than one means.  See Fed. R. Crim. P. 7(c) ("It may be alleged in a single count that the means
by which the defendant committed the offense are unknown or that the defendant committed it
by one or more specified means.").  It is well settled that while criminal statutes are drafted in the
disjunctive, violations of those statutes may be pleaded in the conjunctive.  See Turner v. United
States, 396 U.S. 398, 420 (1970).

      A conspiracy indictment presents "unique issues" in duplicity analysis, because "a
single agreement may encompass multiple illegal objects."  United States v. Aracri, 968 F.2d
1512, 1518 (2d Cir. 1992) (quoting Murray, 618 F.2d at 896).  In the Second Circuit, it is well
settled that the allegation in a single count of a conspiracy to commit several crimes is not
duplicitous because the "conspiracy is the crime and that is one, however diverse its objects."  Id.
(quoting Murray, 618 F.2d at 896).  The Second Circuit has expressly rejected Fifth Circuit

precedent holding that acts capable of being charged as separate offenses must be charged in separate counts.  Id.  Rather, in the Second Circuit, "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." United States v. Tutino, 883 F.2d 1125, 1141 (2d Cir. 1989) (affirming two sales of heroin in one count);  see United States v. Moloney, 287 F.3d 236, 241 (2d Cir. 2002) (series of financial acts combined into one count of money laundering); United States v. Margiotta, 646 F.2d 729, 733 (2d Cir. 1981) (50 mailings combined into one count of mail fraud); see also United States v. Stitsky, 536 Fed. Appx. 98, 104 (2d Cir. Oct. 17, 2013) (affirming and denying multiplicity challenge to two substantive securities fraud counts that charged based upon the type of security being offered, noting that transactions in separate securities constitute separate offenses); United States v. Regensberg, 604 F. Supp. 2d 625, 627, 629-30 (S.D.N.Y. 2009) (denying multiplicity challenges to two substantive securities fraud counts; Count One charged the defendant with securities fraud over a specified time period involving one security; Count Two charged the defendant with securities over a specified time period involving a different security).[2]

A related issue is that of multiple conspiracies.  The question of whether a charged conspiracy is a single conspiracy or in fact multiple conspiracies "is a question of fact for a properly instructed jury." United States v. Chavez, 549 F.3d 119, 125 (2d Cir. 2008).  Thus, where the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more than one conspiracy has been established is a question of fact

---

[2] The Second Circuit has noted that aggregation may "inure to a defendant's benefit" by limiting a defendant's exposure at sentencing, and avoiding a portrayal of the defendant as someone accused of multiple crimes.  United States v. Olmeda, 461 F.3d 271, 281 (2d Cir. 2006).

16

for the jury.  United States v. Orozco-Prada, 732 F.2d 1076, 1086 (2d Cir. 1984).  On the other

hand, where only one conspiracy has been alleged and proved, the defendant is not entitled to a

multiple-conspiracy charge.  See United States v. Maldonado-Rivera, 922 F.2d 934, 962 (2d Cir.

1990).

   A single conspiracy, however, "is not transformed into multiple conspiracies

merely by virtue of the fact that it may involve two or more phases or spheres of operation, so

long as there is sufficient proof of mutual dependence and assistance."  United States v. Geibel,

369 F.3d 682, 689 (2d Cir. 2004).  Moreover, "[c]hanges in members, differences in time

periods, and/or shifting emphasis in the location of operations do not necessarily require a

finding of more than one conspiracy."  United States v. Jones, 482 F.3d 60, 72 (2d Cir. 2006).

The charged conspiracy can properly be found by the jury even where there are multiple groups

within it, as long as they "share a common goal and depend upon each other and assist each

other" and the jury finds that "each actor was aware of his part in a larger organization where

others performed similar roles."  United States v. Berger, 224 F.3d 107, 115 (2d Cir. 2000).[3]

   Thus, where a conspiracy count charges one continuing scheme, even where the

scheme involves different companies, the conspiracy count is properly pled and not duplicitous.

See Aracri, 968 F.2d at 1518 (rejecting duplicity challenge to conspiracy to defraud the Internal

Revenue Service by evading the payment of gasoline taxes utilizing a series of different shell

companies, because the charged conspiracy could be characterized as one continuing scheme).

---

[3] Even in a situation where a multiple conspiracy versus single conspiracy charge is
submitted to the jury, it is well settled that the jury should be instructed that it should convict
if it finds that one of the proven conspiracies was the conspiracy charged in the indictment
and that the defendant was a member of the conspiracy.  See, e.g., United States v. Payne,
591 F.3d 46, 63 (2d Cir. 2010); Aracri, 968 F.2d at 1519 (quoting United States v. Alessi,
638 F.2d 466, 472 (2d Cir. 1980)).

B.     Application

Count One of the Superseding Indictment appropriately charges Morris and Cane as being part of a conspiracy with co-defendants Discala, Josephberg, and others, including Wexler and Bell, to commit securities fraud, in violation of 18 U.S.C. § 371, by defrauding investors and potential investors in the Manipulated Public Companies.  Count Two of the Superseding Indictment appropriately charges Morris and Cane as being a part of a conspiracy with these same co-defendants and others with conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349, by defrauding investors and potential investors in the Manipulated Public Companies.

Count Four appropriately charges Cane, for the time period from March 2014 through July 2014, along with co-defendants Discala, Josephberg and others, including Bell and Wexler, with committing securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, by defrauding investors and potential investors in Cubed.

1.     Counts One and Two Each Properly Charges Single Conspiracies and Are Not Duplicitous

Counts One and Two of the Superseding Indictment appropriately charge Morris and Cane as participating in a conspiracy to manipulate the stocks of the Manipulated Public Companies.  While Cane argues that Counts One and Two charge four different conspiracies because they involve four different companies (Cane Mem. at 10-13) and Morris argues that they charge two distinct crimes (Morris Mem. at 11-15), Counts One and Two each appropriately charge a single conspiracy, not multiple conspiracies.

As set out in the Superseding Indictment, Discala, in conjunction with a group including attorneys, registered brokers, and company insiders, took control of the Manipulated Public Companies and engaged in a single scheme to enrich members of the conspiracy by

18

defrauding investors and potential investors in the Manipulated Public Companies by: (1) issuing false and misleading press releases; (2) making false and misleading SEC filings; (3) fraudulently concealing the defendants' and their co-conspirators' beneficial ownership of stock; (4) engineering price movements and trading volume in the stocks; and (5) making unauthorized purchases of the stock in accounts of unwitting investors.  (S1 Ind. ¶ 18).

This conspiracy centered on Discala and OmniView, and during the course of that conspiracy, several participants changed.  Morris (a broker) and Cane (an attorney) were two of the individuals who joined this conspiracy; Morris was active during the CodeSmart portion of the conspiracy in 2013, while Cane was active during the Cubed portion of the conspiracy in 2014.  The law is clear that changes in the participants of a conspiracy do not create multiple conspiracies.  See Jones, 482 F.3d at 72 (changes in members, differences in time periods, and shifting emphasis in the location of operations do not require a finding of more than one conspiracy); Aracri, 968 F.2d at 1518 (conspiracy involving conduct across different companies not duplicitous).  Notably, during the entire conspiracy, OmniView and a core group of common defendants were always involved – Discala, Josephberg, Bell and Wexler.  The methods employed to effect the manipulation remained the same as well.[4]

---

[4] Morris argues that Counts One and Two involve multiple conspiracies because the government has referred to the CodeSmart scheme and Cubed scheme as two different schemes, and argues that therefore they represent two different conspiracies.  (Morris Mem. at 12).  That argument is wrong.  It is hornbook law that each security used in a securities fraud scheme constitutes a different transaction.  See Stitsky, 536 Fed. Appx. at 104.  Thus, with respect to substantive securities fraud charges, CodeSmart and Cubed constitute separate schemes, and the government separately charged substantive securities fraud counts related to the CodeSmart manipulation (Count Three) and a separate count related to the Cubed manipulation (Count Four).

Further, the charging instrument itself makes clear that Morris and Cane were aware that they were part of a "larger organization where others performed similar roles." United States v. Berger, 224 F.3d at 115.  Morris, a registered broker, was a Managing Director at Halcyon, supervised Josephberg and his assistant, and knew Discala was trading CodeSmart's stock in multiple accounts in the names of others.  Cane, an attorney who joined the conspiracy as Darren Ofsink, another attorney, ceased working with Discala and OmniView, dealt with Discala, OmniView, Bell and Wexler.  Thus, the Superseding Indictment itself makes clear that Morris and Cane joined a single conspiracy that centered on Discala, OmniView and a group of core defendants to defraud investors and potential investors in the Manipulated Public Companies.[5]

    2.    Count Four Properly Charges a Securities Fraud Scheme and Is Not Duplicitous

Cane also challenges Count Four as being duplicitous because it charges Cane with participating in a scheme to defraud investors and potential investors in Cubed for the time period from March 2014 to July 2014, rather than for each Cubed transaction.  (Cane Mem. at 13).  It is well settled in the Second Circuit, however, that "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." Tutino, 883 F.2d at 1141.  Accordingly, Count Four is properly pled. See, e.g., Moloney, 287 F.3d at 241 (series of financial acts combined into one count of money laundering); Margiotta, 646 F.3d at 733 (50 mailings

---

    [5] Further, Cane's and Morris's arguments that Counts One and Two of the Superseding Indictment would prove multiple conspiracies rather than a single conspiracy are premature.  The question of whether the government would prove a single conspiracy or has instead proven multiple independent conspiracies "is a question of fact for a properly instructed jury." Aracri, 968 F.2d at 1519 (quoting Alessi, 638 F.2d at 472).

20

combined into one count of mail fraud).  While the government may choose to charge individual

securities transactions, it may also charge the scheme to defraud in a security for a specified time

period.  See Regensberg, 604 F.Supp.2d at 629-30 (denying challenges to securities fraud counts

that charged a specified time period).

## V.       THE COURT SHOULD DENY MORRIS AND CANE'S MOTIONS TO SEVER

Morris and Cane each move to sever their trial from that of their co-defendants.

They both argue that they were improperly joined in the Superseding Indictment in violation of

Federal Rule of Criminal Procedure 8(b).  (Morris Mem. at 12; Cane Mem. at 4-6).  In the

alternative, even if joinder is appropriate, Morris and Cane each contend that their trials should

be severed pursuant to Federal Rule of Criminal Procedure 14 because a joint trial with Discala

and Josephberg or each other would result in unfair prejudice.  (Morris Mem. at 15; Cane Mem.

at 7).  Instead of one trial, they propose that the case be split into three trials: (1) a trial for

Morris; (2) a trial for Discala and Josephberg; and (3) a trial for Cane.  (Morris Mem. at 12, 23;

Cane Mem. at 9-10).  As set forth below, their arguments fail on the merits.

Joinder is appropriate in this case because, as set forth in the Superseding

Indictment and argued above, Morris and Cane are charged with participating in the same

securities fraud conspiracy charged in Count One and the same mail and wire fraud conspiracy

charged in Count Two with Discala, Josephberg and each other.  The manipulation of the stock

of both CodeSmart and Cubed arose out of a common plan and scheme orchestrated by Discala.

Moreover, neither Morris nor Cane would suffer any unfair prejudice because of joinder and

severance of their trials would result in unnecessary delay and inefficiency.

A.       Legal Standard

Federal Rule of Criminal Procedure 8(b) ("Rule 8") provides that an indictment

may charge multiple defendants "if they are alleged to have participated in the same act or

21

transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b). Under the rule, "joinder is proper where two or more persons' criminal acts are unified by some substantial identity of facts or participants or arise out of a common plan or scheme." United States v. Rittweger, 524 F.3d 171, 177 (2d Cir. 2008) (internal quotations omitted).

The Supreme Court has consistently reaffirmed "a preference in the federal system for joint trials of defendants who are indicted together" because they promote efficiency and prevent the injustice of inconsistent verdicts. Zafiro v. United States, 506 U.S. 534, 537 (1993); see also United States v. Cardascia, 951 F.2d 474, 482-83 (2d Cir. 1991); United States v. Ventura, 724 F.2d 305, 312 (2d Cir. 1983) (where "defendants . . . are jointly indicted [they] should be jointly tried"). Furthermore, joint trials "limit inconveniences to witnesses, avoid delays in bringing defendants to trial and permit the entire story to be presented to a single jury." United States v. Rucker, 32 F. Supp. 2d 545, 547 (E.D.N.Y. 1999); see also United States v. Barrett, 824 F. Supp. 2d 419, 432-33 (E.D.N.Y. 2011).

As the Supreme Court has noted:

> It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability—advantages which sometimes operate to the defendant's benefit. Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

Richardson v. Marsh, 481 U.S. 200, 209-10 (1987); see also Bruton v. United States, 391 U.S. 123, 134 (1968) (joint trials conserve state funds, diminish inconvenience to witnesses, and avoid delays); United States v. Lyles, 593 F.2d 182, 191 (2d Cir. 1979) (joint trials conserve resources, lessen the burden on jurors and avoid repetitive testimony).

Even where defendants are properly joined, however, Federal Rule of Criminal Procedure 14(a) ("Rule 14") permits separate trials where the joinder "appears to prejudice a defendant." On a defendant's Rule 14 motion to sever, the court must balance the efficiency of a joint trial against the possibility of prejudice to a defendant. See United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003); see also United States v. Shellef, 507 F.3d 82, 98 (2d Cir. 2007). For this analysis, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money and scarce judicial resources that joint trial permits." United States v. Jimenez, 824 F. Supp. 351, 366 (S.D.N.Y. 1993). The presumption in favor of a joint trial is especially compelling where, as here, the acts alleged in the indictment are "unified by some substantial identity of facts or participants or arise out of a common scheme or plan," United States v. Attanasio, 870 F.2d 809, 815 (2d Cir. 1989) (internal quotation marks and citations omitted), or where, as here, the defendants are both "charged in the same conspiracy." United States v. Pirro, 76 F. Supp. 2d 478, 483 (S.D.N.Y. 1999) (collecting cases). Because Rule 8 "authorizes some prejudice against the defendant, a defendant who seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice." United States v. Amato, 15 F.3d 230, 237 (2d. Cir. 1994) (internal quotations and citations omitted); see also, e.g., United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (defendant bears an "extremely difficult burden"). Thus, a court should sever defendants only where "there is a serious risk that a joint trial would compromise a specific

23

trial right of one of the defendants, or prevent the jury from making a reliable judgment about

guilt or innocence."  Rittweger, 524 F.3d at 179 (quoting Zafiro, 506 U.S. at 539); see also

United States v. Friedman, 854 F.2d 535, 563 (2d Cir. 1988) (defendant must show that a

"miscarriage of justice" would result to warrant severance).

      B.    Morris and Cane Were Properly Joined in the Superseding Indictment

      Joinder under Rule 8(b) is appropriate in this case.  The Superseding Indictment

clearly alleges that Morris and Cane conspired to commit and actually committed securities fraud

with Discala, Josephberg and others, and conspired to committed mail and wire fraud with

Discala, Josephberg and others.  "A non-frivolous conspiracy charge is sufficient to support

joinder of defendants."  United States v. Nerlinger, 862 F.2d 967 (2d Cir. 1988); see also United

States v. Uccio, 917 F.2d 8, 87 (2d Cir. 1990) (where jury convicted defendants of single

conspiracy, joinder was proper).  The substantive counts are integrally related to the conspiracy

counts.  See Rittweger, 524 F.3d at 178.  "Under the plain language of Rule 8(b), the decision to

join parties turns on what is 'alleged' in the 'indictment.'"  Id.  Indeed, this case presents a

straightforward example of a case in which criminal acts are "unified by some substantial

identity of facts or participants," and "arise out of a common plan or scheme," Rittweger, 524

F.3d at 177, making a joint trial appropriate.  It was, therefore, permissible pursuant to Rule 8(b)

join Discala, Josephberg, Morris and Cane in one indictment.

      As set out in the Superseding Indictment, Discala, in conjunction with a group

including attorneys, registered brokers, and company insiders, took control of the Manipulated

Public Companies, and engaged in a scheme to enrich members of the conspiracy by defrauding

investors and potential investors in the Manipulated Public Companies by: (1) issuing false and

misleading press releases; (2) making false and misleading SEC filings; (3) fraudulently

concealing the defendants' and their co-conspirators' beneficial ownership of stock; (4)

engineering price movements and trading volume in the stocks; and (5) making unauthorized purchases of the stock in accounts of unwitting investors.  (S1 Ind. ¶ 18).  Indeed, this case presents a straightforward instance where criminal acts are "unified by some substantial identity of facts or participants," and "arise out of a common plan or scheme," Rittweger, 524 F.3d at 177, making a joint trial appropriate.

C.    There is No Unfair Prejudice in Trying the Defendants Together

Morris and Cane argue that they will face unfair prejudice if they are tried with Discala, Josephberg or each other because the jury will hear evidence relating to all four of the Manipulated Public Companies, while Morris only participated in the CodeSmart scheme and Cane only participated in the Cubed scheme.  (Morris Mem. at 18, Cane Mem. at 6).  These arguments are meritless.  While the defendants are correct that at a joint trial certain evidence applicable specifically to the co-defendants will be admitted as to those defendants, that evidence is no more inflammatory than the evidence to be presented against Morris and Cane with respect to each of their involvement in the charged conspiracies and securities fraud counts.

In her motion, Cane claims that she should be severed because courts have severed charges and defendants where a single defendant is the only link between a series of diverse schemes.  (Cane Mem. at 5) (citing United States v. Lech, 161 F.R.D. 255 (S.D.N.Y. 1995); United States v. Menashe, 741 F. Supp. 1135 (S.D.N.Y. 1990)).  But the cases Cane cites are inapposite—this case does not involve a single defendant linked by a series of diverse schemes.  This conspiracy centers on Discala, OmniView, a common scheme to manipulate the stock of the four Manipulated Public Companies, and a core group of defendants who were involved in the manipulation of all four companies.  As Cane herself concedes, two of the remaining defendants in this case, Discala and Josephberg, were involved in the manipulation of each of the four Manipulated Public Companies.  (Cane Mem. at 6).  Further, two other

25

defendants who have pled guilty in this case, Wexler and Bell, were also charged with the manipulation of all four of the Manipulated Public Companies.  See Feyrer, 333 F.3d 110, 114 (common participants in schemes considered in severance analysis, even if they have already pled guilty and thus are not proceeding to trial).

Indeed, this case is on all fours with the Second Circuit's decision in Feyrer affirming the district court's denial of severance in a securities fraud, wire fraud and commercial bribery scheme case with multiple defendants.  333 F.3d at 113.  In that case, defendant Yost controlled a company called Banyan Corporation that had publicly-traded stock.  Id.  A co-defendant Goldenberg controlled a company called First Colonial that had publicly-traded stock. Id.  Both men were involved in parallel schemes to manipulate the stock of the companies that they each controlled by paying undisclosed bribes to brokers employed by Symons Financial Group ("Symons") to recommend the stock of their respective companies.  Id.  Yost and Goldenberg were charged together along with Clyde Feyrer, a middleman in both schemes who stood between Yost and Goldenberg, on the one hand, and the principals of the Symons brokerage firm, on the other hand.  Id.  Yost and Goldenberg met once in Las Vegas during a meeting with the principals of Symons, during which the Symons' principals discussed selling the stock of Banyan and First Colonial in return for bribes.  Id.  Feyrer pled guilty and cooperated with the government.  Id.

After Yost and Goldenberg were convicted at trial, Yost appealed, arguing, among other things, that his case should have been severed from Goldenberg's.  Feyrer, 333 F.3d at 113.  Yost argued that he and Goldenberg were involved in two separate and distinct conspiracies involving two different companies, Banyan and First Colonial, and that the two

conspiracies were not factually or temporally related.  See id. at 114.  The Second Circuit

soundly rejected those arguments in a holding applicable here:

> There can be no doubt that the charges against Yost and
> Goldenberg were united by overlapping facts and participants and
> a common plan.  For instance, Feyrer, [an associate of Symons]
> and the brokers at the Symons Group were common and central
> participants in both stock manipulation plans.  The fact that neither
> Feyrer nor Wolff was tried alongside Yost and Goldenberg does
> not alter the significance of their participation.  Moreover, the two
> conspiracies shared a common plan, namely, to generate income
> for Feyrer, [the Symons associate] and the Symons Group brokers
> through fraudulent stock transactions.

Feyrer, 333 F.3d at 114.

Morris and Cane both compare this case to United States v. Rajaratnam, 753 F.

Supp. 2d 299 (S.D.N.Y. 2010).  (Morris Mem. at 14; Cane Mem. at 8).  However, Rajnaratam is

clearly distinguishable.  In that case, Rajnaratam, the principal of hedge fund Galleon, and

Chiesi, an employee of another hedge fund, New Castle Partners, were indicted together in a 19-

count superseding indictment.  See Rajaratnam, 753 F. Supp. 2d at 301.  Rajaratnam was charged

with four insider trading conspiracies that did not involve Chiesi.  See id.  Chiesi was charged

with two insider trading conspiracies that did not involve Rajaratnam.  See id.  Rajaratnam and

Chiesi were charged in one insider trading conspiracy count together involving information

about the company Advanced Micro Devices ("AMD").  See id.  Rajaratnam and Chiesi were

also charged with substantive insider trading charges.  The court found that while seven of the

counts were wholly unrelated, [6] the government could try together twelve counts that involved

_____

[6]  In response to government arguments in Rajnaratam that the indictment charged "two
overarching conspiracies" in which both defendants participated, Judge Holwell noted, "Why the
government may have charged two alleged insider trading rings as seven different conspiracies is
something of a mystery but is immaterial for purposes of the pending motions. The Indictment
must be measured under Rule 8(b) not by what the government could have alleged or what it

schemes related to AMD.  Thus, the court permitted the government to try together: (1) a

common conspiracy count involving AMD (Count Six); (2) two conspiracy counts against Chiesi

that involved inside information about AMD (Counts Five and Seven); (3) a conspiracy count

against Rajaratnam involving inside information about AMD (Count Four); and (4) eight related

substantive counts.  See id. at 312-16, 317.  Here, unlike in Rajaratnam, OmniView and its

principal (Discala) were involved in each of the Manipulated Companies.  Moreover, here, there

was a common securities fraud scheme involving the four Manipulated Public Companies.  With

respect to each of the Manipulated Public Companies, Discala, OmniView and members of the

conspiracy took control of a publicly-traded microcap company, and then, using the methods

described supra 18-19, manipulated their stock to benefit members of the conspiracy.  Discala,

Wexler, OmniView, Josephberg and Bell were common and central participants in the overall

scheme.

      In sum, a joint trial is appropriate here.

      1.     The Trials Should Not Be Severed Due to Antagonistic Defenses

      Morris and Cane also argue that they will be prejudiced because each intends to

offer a defense that will be mutually antagonistic to Discala's and/or Josephberg's defense.

(Morris Mem. at 15-16; Cane Mem. at 9).  The term "mutually antagonistic" has been adopted to

describe a category of adversarial defenses where "accepting one defense requires that the jury

must of necessity convict a second defendant."  United States v. Yousef, 327 F.3d 56, 151 (2d

---

hopes to prove but by the language the government has actually used in charging the defendants
with their alleged crimes."  753 F. Supp. 2d at 307.  In sum, Judge Holwell's comments suggest
that the severance motion would not have been granted had the government charged the case as
two conspiracies rather than seven.

Cir. 2003).  The Supreme Court concluded that there is no "bright-line rule" that mutually

antagonistic defenses require severance.  Zafiro, 506 U.S. at 538.  Severance based on mutually

antagonistic defenses is required only where a joint trial would "compromise a specific trial right

of one of the defendants," for example, by allowing the jury to consider prejudicial evidence that

would have been inadmissible at a separate trial, or would prevent the jury from "making a

reliable judgment about guilt or innocence." Id. at 538.

        In Zafiro, severance was not required even though both defendants claimed they

were the innocent dupe of the other. Id. at 539. Zafiro overruled prior Second Circuit precedent

on this point, including United States v. Serpoosh, 919 F. 2d 835, 838 (2d Cir. 1990). See also

United States v. Haynes, 16 F.3d 29, 29-31 (2d Cir. 1994) (severance not required even though a

defendant is implicated by his co-defendant's testimony); United States v. Diaz, 176 F.3d 52,

103-014 (2d Cir. 1999) (severance not required even though one defendant testified that co-

defendant committed murder and co-defendant testified that defendant attempted to murder him);

United States v. Harwood, 998 F.2d 91, 95-96 (2d Cir. 1993) (no severance where defendants

claimed they knew nothing about drugs and blamed each other); see also United States v. Scott,

637 Fed. App'x 10, 13 (2d Cir. 2015), cert. denied, 137 S. Ct. 208 (2016) ("It is not enough to

demonstrate that separate trials would have increased the chances of the appellant's acquittal …

the defendant must instead show prejudice so severe that his conviction constituted a miscarriage

of justice and amounted to a denial of a constitutionally fair trial") (internal quotations and

quotation marks omitted).

        "In those rare instances where a defendant establishes a 'high' risk of prejudice,

however, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk

of prejudice.'" United States v. Abakporo, No. 12-CR-340 (SAS), 2013 WL 6188260, at *3

(S.D.N.Y. Nov. 25, 2013) (quoting Zafiro, 506 U.S. at 539).  In such a case, "the tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion."  Id.; see also Yousef, 327 F.3d at 150 ("the fashioning of remedial steps to minimize prejudice to a defendant is committed to the sound discretion of the district court").

Morris argues that he expects to present facts at trial that amount to a defense antagonistic to, and in fundamental conflict with, "any defense Discala and Josephberg could possible argue."  (Morris Mem. at 15-16).  However, Morris is not entitled to severance because acceptance of his alleged factual defenses would not preclude the acquittal of Discala or Josephberg.  In fact, most of the facts cited by Morris, even if true, are not defenses to the charged crimes.

As background, Morris appears to argue that he, Discala and Josephberg did not like each other, and they each attempted to make the most money from their CodeSmart stock to the detriment of the other's economic interest at times.  (Morris Mem. at 7-8).  With respect to the "antagonistic defense," Morris plans to argue at trial that Discala's trading activities caused Halcyon to suffer losses because Discala, with Josephberg's complicity, accumulated a trading debt that Discala could not pay.  Morris claims that he ceased all dealings with Discala and Josephberg in September 2013.  These "defenses" are not legal defenses to the charged crimes, and they are also not defenses antagonistic to Discala and Josephberg.  Co-conspirators do not need to be friends in order to commit crimes together.  At trial, Discala, Josephberg and Morris all will likely argue that their stock acquisitions and trading activities were not illegal.  While Morris may argue that he was unaware of certain facts with respect to Discala's and Josephberg's activities, Discala and Josephberg are unlikely to implicate Morris in a crime as part of their defense, nor does he argue that they are likely to do so.

Second, it likely will not be disputed that Discala ran up a large margin debt at Halcyon that resulted in the freezing of certain of Discala's trading accounts and caused problems for Halcyon's business.  In fact, the government expects to show at trial that, as a result of this debt, Morris, Discala and Josephberg engaged in manipulative trading in CodeSmart stock.  (S-1 Ind. ¶ 27).  And, third, it will not to be disputed that, in the fall of 2013, Josephberg stopped working at Halcyon, and Discala took his business to the broker-dealer that hired Josephberg after he left Halcyon.  (S-1 Ind. ¶ 4).

What the above shows is that when the charged stock manipulation scheme was successful, it was profitable for all, including Morris, who profited from selling the CodeSmart stock that he and his son acquired through Discala and from the trading commissions that Discala generated for Halcyon.  However, when Discala made unprofitable trades, agreements Halcyon entered into with other broker-dealers to facilitate Discala's trading resulted in losses to Halcyon.

Cane argues that she will take the position that the wash trades and matched trades charged in the Superseding Indictment were orchestrated by Discala and the broker defendants, while, she claims, Discala will claim that the improprieties relating to the "escrow account" used in connection with Cubed were entirely Cane's fault.  (Id.).  Cane claims that she and Discala will effectively prosecute each other at trial.  (Id.).

But these defenses do not rise to the level of "accepting one defense requires that the jury must of necessity convict a second defendant."  Yousef, 327 F.3d at 151.  Even if the jury concludes that Cane was responsible for the "escrow account" used with respect to Cubed, that, standing alone, would not lead a jury to convict Cane.  Simply setting up an escrow account, as that term is typically understood, is not illegal.  The government will still have the

burden of showing how the "escrow account" furthered the charged crimes here, and that Cane had the requisite criminal intent.

Cane and Morris both rely upon the decision granting severance in <u>United States v. Shkreli,</u> Slip Op. 15-CR-637 (KAM) (E.D.N.Y. April 19, 2017) (Dkt. No. 198) ("Shkreli Slip Op."), at 20-21. Cane also cites <u>United States v. Aronson</u>, No. 12-CR-245 (ADS) (E.D.N.Y. May 23, 2013) (Dkt. No. 167), at 15. Those cases, which involved advice-of-counsel defenses, are inapposite. In <u>Shkreli</u> and <u>Aronson</u>, the attorney defendants indicated that the non-attorney defendant lied to them, while the non-attorney defendants each argued that they relied to their detriment upon the advice of their respective attorney defendant. Unlike the defendants in <u>Shkreli</u> and <u>Aronson</u>, Discala has not asserted an advice-of-counsel defense against Cane, and Cane has not claimed that Discala gave her faulty information upon which she provided legal advice to him.[7] There appears to be no mutually antagonistic defenses here.

Moreover, even if the defenses asserted by Morris and Cane were in fact antagonistic and prejudicial to Discala's, neither can meet the heavy burden required for severance: "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro</u>, 506 U.S. at 539. Accordingly, their motions for severance should be denied.

2.     <u>The Trials Should Not Be Severed Due to Disparity of Evidence</u>

Morris also argues his trial should be severed from the trial of Discala, Josephberg and Cane because Morris claims that the volume of evidence against Discala and Josephberg with respect to all four schemes, particularly the wiretap evidence that primarily relates to the

---

[7] It is noteworthy that even in that factual setting, no mutually antagonistic defenses were found. <u>See</u> Shkreli Slip Op. at 11-15 (rejecting mutually antagonistic argument).

Cubed scheme, dwarfs the proof against him with respect to the CodeSmart scheme.  (Morris

Mem. at 21-22).  Cane raises similar arguments.  (Cane Mem. at 8).

    The fact that the evidence may be more voluminous against co-defendants is not a

basis for severance.  See United States v. Locasacio, 6 F3d. 924, 947 (2d Cit. 1993) ("joint trials

involving defendants who are only marginally involved alongside those heavily involved are

constitutionally permissible").  While the government has correctly charged, in Count One and

Count Two, an overall conspiracy covering all the Manipulated Public Companies, it will not be

difficult for the jury to understand Morris's and Cane's roles in the conspiracy, as well as the

time frame in which each was a participant, as compared to Discala and Josephberg.

    Furthermore, while Morris appears to be claiming that the government has

stronger evidence of the Cubed scheme than the CodeSmart scheme, in many respects, this is not

true.  While the intercepted calls provide strong evidence of the Cubed scheme, almost all other

categories of evidence relate to both schemes.  First, documents obtained from OmniView and

Bell relate to both CodeSmart and Cubed.  Bell played a similar role to Josephberg in terms of

selling CodeSmart stock to his clients.  Also, unlike the Cubed scheme, which was halted while

the stock price was still being pumped, the CodeSmart scheme had been completed with millions

of dollars in profits earned by the charged co-conspirators and corresponding losses to the

victims.  Finally, several of the cooperating witnesses will testify as to both schemes.

    In sum, there is no large disparity in culpability between Morris, Cane and their

co-defendants, and, accordingly, the prospect of a joint trial does not raise the specter of

substantial prejudice.

## VI.     THE COURT SHOULD DENY CANE'S MOTION FOR A JURY QUESTIONAIRRE

Cane requests a written jury questionnaire, primarily to ask prospective jurors about potential bias related to Cane's personal status.  (Cane Mem. at 14).  In addition, Cane seeks to ask questions regarding the financial status and experience of prospective jurors.  (Cane Mem. at 15).  The government believes that no written questionnaire is needed, and to the extent that the Court finds that voir dire regarding Cane's personal status is advisable here, such questions could be addressed during the Court's normal voir dire process, and do not require a written questionnaire.

### A.     Legal Standard

District courts have "ample discretion in determining how best to conduct voir dire."  Rosales-Lopez v. United States, 451 U.S. 182, 189 (1981).  In United States v. Quinones, 511 F.3d 289, 299 (2d Cir. 2007), the Second Circuit noted that the decision to employ a questionnaire during voir dire is within the district court's discretion.  The Quinones court cited examples of when a jury questionnaire had been employed during voir dire, including: "where a large number of prospective jurors must be screened …; where an anonymous jury is to be empaneled …; where there has been extensive pre-trial publicity; or where the death penalty is sought . . . ." (citation omitted).  Id. at 299-300.

The Supreme Court has held that a court must make inquiry of a potential jurors about possible bias related to a defendant's national origin, ethnicity or race when "the circumstances of the case indicate that there is a reasonable possibility that the racial or ethnic prejudice might [influence] the jury."  Rosales-Lopez, 451 F.2d at 191.  This occurs when, for example, these "issues are inextricably bound up with the conduct of the trial."  Risiano v. Ross, 424 U.S. 589, 597 (1976).  There is no bright line test as what to what cases qualify for this

34

treatment.  Rather, this matter is left to the trial court's discretion.  Rosales-Lopez, 451 F.2d at 191-192.

        B.      <u>Application</u>

        The government respectfully submits that Cane's request for a jury questionnaire should be denied because the government does not intend to elicit testimony regarding the subject matter of Cane's personal status, and no questionnaire regarding the financial status and experience of prospective jurors is necessary here.  See Rosales-Lopez, 451 F.2d at 191-92 (inquiry regarding potential bias at the court's discretion).  To the extent that the Court finds that voir dire regarding Cane's personal status is advisable here, the government requests that the Court address those questions during the Court's normal voir dire process, and without a written questionnaire.

## VI.    THE COURT SHOULD DENY DISCALA'S MOTION TO SUPPRESS THE <u>WIRETAP WITHOUT A HEARING</u>

        Discala argues that the wiretap should be suppressed because (1) the government's wiretap application allegedly violated <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978); (2) the wiretap application allegedly failed to demonstrate necessity under 18 U.S.C. § 2518(1)(c); and (3) the government allegedly failed to "minimize the interception of non-pertinent communications," in violation of 18 U.S.C. § 2518(5).  (Discala Mem. at 2-20).  These arguments are without merit and Discala's motion to suppress the wiretap should be denied without a hearing.

        A.      <u>The Wiretap Affidavit</u>

        In furtherance of his investigation into the Defendants' stock market manipulation schemes, FBI Special Agent Michael Braconi applied for and obtained a Title III wiretap order on May 1, 2014.  This wiretap was authorized by order of the Honorable P. Kevin Castel of the

Case 1:14-cr-00399-ENV   Document 380   Filed 11/17/17   Page 40 of 95 PageID #: 2524

Southern District of New York on May 1, 2014 ("Wiretap Order," attached hereto as Ex. A),

based upon an affidavit submitted by Special Agent Braconi on the same date ("Wiretap

Affidavit," attached to Discala's Motion as Ex. A).  In the Wiretap Affidavit, Special Agent

Braconi explained that the cellular telephone number 914-255-7892 was subscribed to and used

by Discala (the "Discala Telephone").  (Wiretap Affidavit ¶ 4).  The Wiretap Affidavit sought,

and the Wiretap Order authorized, the interception of wire and electronic communications –

including telephone call and text message content – sent to or received by the Discala Telephone.

(Id.; Wiretap Order at 3).[8]  FBI agents began monitoring the wiretap of the Discala Telephone on

May 2, 2014, and terminated the wiretap on June 29, 2014.

        In his Wiretap Affidavit, Special Agent Braconi provided extensive information

establishing probable cause to believe that Discala and his co-conspirators had committed and

were continuing to commit wire fraud and securities fraud, among other crimes, and that

evidence of these crimes would be obtained through the interception of the Discala Telephone.

(Wiretap Affidavit ¶¶ 6, 14-93).  Special Agent Braconi explained that the FBI had identified in

particular two public companies whose stock Discala and his co-conspirators had manipulated:

CodeSmart and Cubed.  (Id. ¶ 14).  While the co-conspirators manipulated CodeSmart shares in

2013, they were still in the process of manipulating Cubed shares at the time of the submission of

the Wiretap Affidavit.  (Id.).  Based on his training, experience and knowledge of the

investigation, Special Agent Braconi stated that he believed that the co-conspirators were using

---

[8] In addition, on May 30, 2014, Special Agent Braconi applied for an order extending the
wiretap an additional 30 days ("Wiretap Extension Affidavit," attached to Discala's Motion as
Ex. B), and the Honorable Alvin K. Hellerstein of the Southern District of New York granted the
application ("Wiretap Extension Order," attached hereto as Ex. B).

text messages and cellular telephone calls to accomplish the ongoing manipulation of Cubed shares.  (Id.).

1.      The CodeSmart Manipulation Scheme

Special Agent Braconi provided abundant information establishing probable cause to believe that Discala and his co-conspirators had manipulated CodeSmart shares.  Probable cause was established primarily by the following facts: (1) CodeSmart became a publicly-traded company through a reverse merger; (2) Discala and his co-conspirators obtained control of a significant amount of the free-trading shares of CodeSmart; (3) CodeSmart made false statements in press releases and filings to artificially inflate the stock price and trading volume; and (4) Discala and his co-conspirators profited from their manipulation scheme by selling their shares at peak prices.  (Wiretap Affidavit ¶¶ 14-93).  In addition, the Wiretap Affidavit set forth information establishing probable cause to believe that Discala used cellular telephone communications to accomplish this manipulation.  Specifically, during the CodeSmart manipulation, Discala communicated consistently using his cellular telephone with co-conspirators, including Shapiro, Goepel (Discala's administrative assistant), Wexler and Bell.[9]

2.      The Cubed Manipulation Scheme

The FBI's investigation uncovered that Discala and his co-conspirators had turned to manipulating Cubed stock after the CodeSmart stock manipulation.  In or about March 2014, a confidential source ("CS1") – who had worked with Discala and had previously provided to the

_____

[9] Discala used a cellular telephone with number 646-309-1549 to communicate with his co-conspirators until about September 30, 2013.  On or about September 30, 2013 – after the CodeSmart shares concluded their dramatic drop from the second price peak – Discala began using the Discala Telephone to communicate with his co-conspirators.  (Wiretap Affidavit ¶ 22).

government accurate information regarding the CodeSmart manipulation – told Special Agent

Braconi that Discala's next step in the scheme involved making another small company publicly

traded and manipulating the share price of that company.  (Id. ¶¶ 19, 59).  CS1 stated that he/she

believed the company was called "Crackpot" or something similar.  (Id. ¶ 59).  Another

confidential source ("CS2") corroborated CS1's statements.  (Id. ¶ 61).

Special Agent Braconi's own investigation of Cubed also corroborated the

information provided by CS1 and CS2.  In particular, Special Agent Braconi uncovered

extensive evidence establishing probable cause to believe that Discala and his co-conspirators

were manipulating Cubed shares, including that Cubed (1) became a publicly-traded company

through an asset purchase agreement in order to avoid SEC scrutiny; (2) misreported to the SEC

its purchase agreement of Crackpot's intellectual property assets; and (3) artificially inflated its

market capitalization through a private share sale at an inflated price that could not be justified

by Cubed's underlying assets and operations.  (Id. ¶¶ 62-74).  In addition, the Wiretap Affidavit

described evidence establishing probable cause to believe that Discala was using cellular

telephone communications to accomplish the Cubed manipulation, including incriminating text

messages with co-conspirators Wexler and Bell.  (Id. ¶¶ 75-88).

B.     The Court Should Deny Discala's Motion for a *Franks* Hearing

Discala argues that the Wiretap Affidavit "is replete with false and misleading

assertions that Special Agent Braconi knew or recklessly failed to know were false when he

made them" and that if Judge Castel had been provided "with a complete and truthful

representation of the facts he would not have issued the Wiretap Warrant."  (Discala Mem. at 9).

Discala asserts that "only through unsupported assumptions, material omissions, and blatant

falsifications" was Special Agent Braconi able to "create the impression of probable cause."

(Id.)  Discala contends that "[w]hen those omissions are remedied and the falsifications removed, it becomes clear that the Wiretap Affidavit is not supported by probable cause."  (Id.) Accordingly, Discala seek a Franks hearing.

For the reasons discussed below, Discala's arguments are baseless.  Because he has not made the requisite substantial showing that Special Agent Braconi intentionally or recklessly made any material misstatements or omissions of facts in the Wiretap Affidavit, he is not entitled to a Franks hearing and his motion to suppress on these grounds should be denied.

1.   The *Franks* Doctrine

Where a defendant argues that an affidavit in support of a search warrant or wiretap contained deliberately misleading or recklessly false information, a hearing can be held to test the accuracy of those claims under Franks in certain limited circumstances.  See United States v. Rajaratnam, 719 F.3d 139, 151 (2d Cir. 2013) (applying analytical framework established in Franks, which involved a physical search, to a wiretap).  To be entitled to such a hearing, "a defendant must make a substantial preliminary showing that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding."  United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998) (internal quotation marks omitted); see also United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003) (noting that "in order to invoke Franks doctrine, a defendant must show that there were intentional and material misrepresentations or omissions in the warrant affidavit.").  As the Supreme Court explained in Franks:

> to mandate an evidentiary hearing, the challenger's attack
> must be more than conclusory and must be supported by more
> than a mere desire to cross examine.  There must be
> allegations of deliberate falsehood or of reckless disregard for

> the truth, and those allegations must be accompanied by an
> offer of proof.  They should point out specifically the portion
> of the warrant affidavit that is claimed to be false; and they
> should be accompanied by a statement of supporting reasons.
> Affidavits or sworn or otherwise reliable statements of
> witnesses should be furnished, or their absence satisfactorily
> explained.  Allegations of negligence or innocent mistake are
> insufficient.

Franks, 438 U.S. at 171.

A defendant seeking to make the first required showing of an intentional or reckless misstatement or omission must show more than inadvertent error.  "[E]very statement in a written affidavit does not have to be true," United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005), and "the mere intent to exclude information is insufficient . . . [because] every decision not to include certain information in the affidavit is intentional insofar as it is made knowingly . . . .  An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation."  Awadallah, 349 F.3d at 67-68 (internal quotation marks omitted).  As the Second Circuit recently explained:

> A wiretap applicant does not necessarily act with 'reckless
> disregard for the truth' simply because he or she omits certain
> evidence that a reviewing court, in its judgment, considers to
> be 'clearly critical.'  Rather, the reviewing court must be
> presented with credible and probative evidence that the
> omission of information in a wiretap application was
> 'designed to mislead' or was 'made in reckless disregard of
> whether it would mislead.'

Rajaratnam, 719 F.3d at 153-54 (emphasis original) (quoting Awadallah, 349 F.3d at 64).  "To prove reckless disregard for the truth," a defendant must "prove that the affiant in fact entertained serious doubts as to the truth of his allegations."  Id. (quoting United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001)).  Reckless disregard "can sometimes be inferred from the omission of critical information in a wiretap application."  Id. at 154 (emphasis original).  "But such an inference is not to be automatically drawn simply because a reasonable

40

person would have included the omitted information . . . and the inference is particularly

inappropriate where the government comes forward with evidence indicating that the omission

resulted from nothing more than negligence, or that the omission was the result of a considered

and reasonable judgment that the information was not necessary to the wiretap application." Id.

at 154-55.

   The moving defendant must also prove that any misstatements or omissions

alleged were material.  To determine if the false information was material, i.e., "necessary to the

issuing judge's probable cause determination . . . a court should disregard the allegedly false

statements and determine whether the remaining portions of the affidavit would support probable

cause to issue the warrant."  United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) (citing

Salameh, 152 F.3d at 113).  "If the corrected affidavit supports probable cause, the inaccuracies

were not material to the probable cause determination and suppression is inappropriate.  As with

the inclusion of false information, 'omissions from an affidavit that are claimed to be material

are governed by the same rules.'"  Id. (quoting United States v. Ferguson, 758 F.2d 843, 848 (2d

Cir. 1985)); see also Rajaratnam, 719 F.3d at 146 (stating that, to determine whether omissions

are material, a court should consider whether, "if the omitted material had been included in the

affidavit, the affidavit would still establish probable cause" (internal quotation marks omitted)).

   2. Discala's Allegations that Special Agent Braconi Made Intentional or
     Reckless Misstatements and Omissions Are Meritless

   Discala alleges a series of misstatements and omissions related to establishing

probable cause, which he claims justifies a Franks hearing and, ultimately, suppression.  None of

these allegations makes the substantial showing required under the Franks doctrine, and

accordingly his motion should be denied.

a.   Special Agent Braconi's Discussion of Reverse Mergers
Was Accurate and Complete

Discala contends that Special Agent Braconi reached "groundless conclusions"
and made "false assumptions when he discusse[d] reverse mergers and refer[red] to an SEC
Investor Bulletin on Reverse Mergers." (Discala Mem. at 13). Specifically, Discala argues that
Special Agent Braconi "only cite[d] self-serving portions of that document and conclude[d] that
the use of a reverse merger is an indicator that securities fraud, wire fraud and unlawful
monetary transactions have occurred." (Id.) Discala concludes that "Agent Braconi's sole
purpose in discussing reverse mergers was to create the impression that reverse mergers are
vehicles used only in illegal schemes." (Id.)

Discala's arguments are unavailing. As an initial matter, Special Agent Braconi
did not discuss reverse mergers to "create" any "impression"; he discussed them because
CodeSmart became a public company through a reverse merger and this fact raised certain red
flags. Furthermore, contrary to Discala's contention, Special Agent Braconi's description and
analysis of reverse mergers in general and CodeSmart's reverse merger in particular were
accurate and complete.

During Special Agent Braconi's discussion of CodeSmart's reverse merger, he
referenced a public SEC Investor Bulletin (the "Bulletin") and provided an online web address to
access this Bulletin. (Wiretap Affidavit ¶ 30). Special Agent Braconi then accurately quoted the
Bulletin in explaining that, while a reverse merger is not by itself unlawful and may be done
because it provides "a quicker and cheaper method of 'going public' than an [IPO,] . . . there
have been instances of fraud and other abuses involving reverse merger companies." (Id.)
(quoting Bulletin, attached to Discala's Motion as Ex. E, at 1-2). Discala complains that the
Wiretap Affidavit omitted that the Bulletin stated that "other kinds of investments" have also had

42

instances of fraud and abuses.  (See Discala Mem. at 13).  But this omission is immaterial because it does not change the fact that reverse mergers – the transaction at issue – have been used to perpetrate fraud and other abuses.  Indeed, the Bulletin stated further:  "In recent months the SEC has suspended trading in a number of reverse merger entities."  (Wiretap Affidavit ¶ 30 (quoting Bulletin at 3)).  In addition, Special Agent Braconi went out of his way to warn that reverse mergers are not by themselves unlawful and can be done for legitimate purposes.  (Id. ¶¶ 30-31).

Special Agent Braconi also accurately and fairly applied the Bulletin's summary of reverse mergers to CodeSmart's reverse merger.  Namely, he stated that, "[a]lthough by itself the reverse merger was not definitive proof of unlawful behavior, based on my training, experience and knowledge of this investigation, including the false statements and rapid increases in CodeSmart's share price . . . , I believe that this reverse merger is an indicator that securities fraud, wire fraud and unlawful monetary transactions have occurred."  (Id. ¶ 31).  In this statement, Special Agent Braconi once again warned the reviewing judge that reverse mergers are not alone proof of unlawful behavior.  He also made clear that his belief that CodeSmart's reverse merger was an indicator of unlawful conduct was not based solely on the suspiciousness of reverse mergers.  Rather, his belief was also based on CodeSmart's misleading public statements intended to artificially inflate the share price and the rapid increases in CodeSmart's stock price.  In addition, the fact that Ira Shapiro – who was in regular contact with Discala during the manipulation scheme and was the author of at least one of the false CodeSmart press statements – had been appointed CEO of CodeSmart directly following the reverse merger was yet another suspicious factor that Special Agent Braconi cited.  (See id. ¶¶ 20-22, 28-30).

43

In sum, Special Agent Braconi accurately and fully explained the lawfulness of and concerns surrounding reverse mergers.  Accordingly, Discala's arguments are baseless.

> b.   Special Agent Braconi Did Not Intentionally or Recklessly Misstate or Omit Any Material Information from His Discussion of CodeSmart's False Statements

Discala argues that Special Agent Braconi intentionally mischaracterized certain press releases and statements issued by CodeSmart that the government alleged were issued "in an effort to artificially inflate the price of CodeSmart shares."  (Discala Mem. at 13-14).  Discala is wrong.  Contrary to Discala's assertions, Special Agent Braconi accurately described the contents of the four statements referenced in his Wiretap Affidavit – a May 28, 2013 press release, a July 12, 2013 Amended Form 8-K, an August 19, 2013 Form 10-Q, and an August 26, 2013 letter to shareholders.  Furthermore, any omissions made by Special Agent Braconi were not designed to mislead and were not material to the reviewing judge's assessment of probable cause.

> i.   May 28, 2013 Press Release

Discala argues that Special Agent Braconi failed (1) to provide any evidence that Discala was involved in the issuance of the May 28, 2013 press release; and (2) to mention the other 51 press releases issued by CodeSmart between May 2013 and October 2013.  (Id. at 14). These arguments are without merit.  As Special Agent Braconi accurately explained, CodeSmart's CEO Ira Shapiro made false statements in the May 28, 2013 press release regarding a deal with Binghamton University in order make CodeSmart appear to the public to be more successful than it actually was.  (Wiretap Affidavit ¶ 33) (citing May 28, 2013 press release, attached to Discala's Motion as Ex. F).  Special Agent Braconi also noted that on the same day, May 28, 2013, the trading volume in CodeSmart stock and CodeSmart's stock price jumped significantly.  (Id.)  Discala's involvement with these false statements was clear from the

44

Wiretap Affidavit: Discala was the leader of the CodeSmart manipulation from the beginning and remained in regular contact with CEO Shapiro throughout the scheme.  (Id. ¶¶ 17-22).  Moreover, the 51 other press releases Discala cites are irrelevant because they do not change the fact that material false statements were made in the May 28, 2013 press release.  And as Special Agent Braconi alleged and supported with abundant proof, the May 28, 2013 false statements were made to further Discala and his co-conspirators' stock manipulation scheme.

ii.        July 12, 2013 Amended Form 8-K

Discala argues that Special Agent Braconi "only selectively cites" the July 12, 2013 Amended Form 8-K (the "July 2013 8-K") in his Wiretap Affidavit and should have included "cautionary" language from the July 2013 8-K to paint an "accurate picture" of CodeSmart's revenue projections.  (Discala Mem. at 14-15).

Discala's argument fails.  As an initial matter, Special Agent Braconi accurately stated that CodeSmart, in the "Plan of Operations" section of its July 2013 8-K, "'estimate[d] about $10 million in revenues over the following 12 months . . . .'"  (Wiretap Affidavit ¶ 34) (quoting July 2013 8-K, attached to Discala's Motion as Ex. I, at 12).  Furthermore, contrary to Discala's assertion, this $10 million revenue estimate did not follow the cautionary language that Discala quotes in the July 2013 8-K.  (See Discala Mem. at 14).  Rather, that cautionary language appeared over a page later in the July 2013 8-K in the "Going Concern" section.  See July 2013 8-K at 13.  Indeed, CodeSmart's $10 million revenue estimate actually directly followed CodeSmart's "goal of enrolling approximately 1,000 existing coders, 1,500 clinicians and approximately 5,000 new coders over the next 12 months."  (See July 2013 8-K at 12).  Special Agent Braconi's omission of standard cautionary language in a separate, later section in the July 2013 8-K was certainly not "designed to mislead" or "made in reckless disregard of

45

whether it would mislead." See Rajaratnam, 719 F.3d at 153-54.  Nor was the omission material

to the reviewing judge's probable cause determination.  See Canfield, 212 F.3d at 718.  What

was material, as Special Agent Braconi explained, is that CodeSmart issued this revenue estimate

on the same day, July 12, 2013, when CodeSmart's share price peaked at a closing price of

$6.94, a 291 percent increase from the May 13, 2013 closing price.  In addition, as Special Agent

Braconi stated, CodeSmart's high revenue projection in the July 2013 8-K – just like the false

statements in the May 28, 2013 press release – was important to the manipulation scheme, not

only to entice public investors reviewing CodeSmart statements but also to enable corrupt

brokers like Matthew Bell to cite this information to clients to fraudulently convince them to

invest.  (See Wiretap Affidavit ¶ 49).

iii.       August 19, 2013 Form 10-Q

Discala contends that Special Agent Braconi improperly concluded from

comparing the July 2013 8-K and the August 19, 2013 Form 10-Q (the "August 2013 10-Q") that

"in the span of one month, CodeSmart's revenue forecast went from $10 million to ceasing

operations, effectively a $0 revenue forecast."  (Discala Mem. at 15) (quoting Wiretap Affidavit

¶ 35).  Discala argues that CodeSmart did not state in the August 2013 10-Q that it was ceasing

operations, but instead stated that if it did not raise additional funding it would have to curtail its

operations.  (Id.).  Discala asserts that this representation in the August 2013 10-Q was "perfectly

in line with the July 12, 2013 8-K."  (Id.)

Discala is correct that both the July 2013 8-K and August 2013 10-Q

contained language in the "Going Concern" section that CodeSmart did "not have sufficient

funds to fully implement [its] business plan" and that, if CodeSmart did not obtain the funds, it

"may need to curtail or cease [its] operations until such time as [it has] sufficient funds."  (See

46

July 2013 8-K at 13; August 2013 10-Q, attached to Discala's Motion as Ex. J, at 4).

Accordingly, although Special Agent Braconi accurately quoted from the August 2013 10-Q, he

arguably should have noted that the same language was contained in the July 2013 8-K.  Special

Agent Braconi also may have overstated CodeSmart's August 2013 10-Q in saying that

CodeSmart was "ceasing operations" and providing "effectively a $0 revenue forecast."  But

neither the omission regarding the July 2013 8-K nor the potential overstatement regarding

CodeSmart's operations were "deliberate falsehoods" or showed a "reckless disregard for the

truth."  See Franks, 438 U.S. at 171.  Rather, they were inadvertent and certainly were not

material to the judge's determination of probable cause given the wealth of other information

provided in the Wiretap Affidavit.  See Rajaratnam, 719 F.3d at 153-55; Canfield, 212 F.3d at

718.

       The key point Special Agent Braconi made in the Wiretap Affidavit is that the

August 2013 10-Q painted a more negative picture of CodeSmart's projections than the July

2013 8-K did.  Specifically, while the "Plan of Operations" section of the July 2013 8-K

estimated that CodeSmart would earn $10 million in revenue over the next 12 months, the "Plan

of Operations" section of the August 2013 10-Q did not include any revenue projection.  (See

July 2013 8-K at 11-12; August 2013 10-Q at 2).  In other words, Special Agent Braconi was

accurate in stating that CodeSmart's revenue forecast went from $10 million to "effectively a $0

revenue forecast."  (Wiretap Affidavit ¶ 35).  In addition, the fact that CodeSmart had earned

only $24,157 in revenue during the previous three months – after it had forecast $10 million

annual revenue just three months prior – also demonstrated how dramatically short of its revenue

projections CodeSmart had fallen.  (See August 2013 10-Q at 2).

Discala's additional argument – that Special Agent Braconi should have included in his Wiretap Affidavit that the August 2013 10-Q reported significantly more cash on hand than the July 2013 8-K – is also unavailing.  (Discala Mem. at 15-16).  The $261,592 in cash that CodeSmart reported in the August 2013 10-Q, though far higher than the $0 in cash reported in the July 2013 8-K, did not reflect a stronger financial picture, as Discala implies in his motion. (See July 2013 8-K at F-1; August 2013 10-Q at F-1).  To the contrary, CodeSmart's loss from operations had increased from a $79,755 loss to a $1,256,465 loss over the respective three month periods covered in the July 2013 8-K and the August 2013 10-Q.  (See July 2013 8-K at F-2; August 2013 10-Q at F-2).  In other words, CodeSmart's revenue and profit figures as of the August 2013 10-Q fell far short of what an investor would have expected after reading the $10 million revenue estimate in the July 2013 8-K.

iv.      <u>August 26, 2013 Letter to Shareholders</u>

Discala asserts that Special Agent Braconi "inappropriately conclude[d] that the August 26, 2013 letter was a reversal from CodeSmart's August 19, 2013 Form 10-Q."  (Discala Mem. at 16).  Discala contends that "Braconi's focus on the risks in the company when it suited him, and the company's potential when that was better for him ignores CodeSmart's honest reporting of its risks and potential."  (<u>Id.</u>).

Once again, Discala's arguments are baseless.  As explained above, the August 19, 2013 10-Q deleted the $10 million revenue estimate contained in the July 2013 8-K, and reported only $24,157 in revenue and a $1,256,465 operating loss over the three previous months.  Then, one week later, on August 26, 2013, CodeSmart issued a letter to its shareholders painting a far more positive picture: "If we continue on the track we are on, I believe we will achieve our revenue and profit goals that were previously disclosed for 2013 and beyond.  We

48

believe we have access to a large market of potential students which we estimate to be over 40 million people looking for careers at any given time." (Wiretap Affidavit ¶ 36) (quoting August 26, 2013 Form 8-K, attached hereto as Ex. C, at 3). Special Agent Braconi's description of CodeSmart "revers[ing] course from its gloomy forecast of August 19, 2013" was spot on. And, after the August 26, 2013 letter, CodeSmart's share price continued its sudden spike to $4.60 on August 30, 2013, from $2.19 on August 21, 2013. (Id. ¶ 37).

For the foregoing reasons, Special Agent Braconi accurately described the false and misleading statements made in the four publications discussed above, with only a few potential exceptions. In those few instances, any misstatements or omissions he arguably made were not intentional or reckless and were certainly not material.

### c. Special Agent Braconi's Analysis of the Price Fluctuations in CodeSmart's Share Price Was Accurate and Reasonable

Discala argues that Special Agent Braconi misrepresented that the price fluctuations in CodeSmart's stock price were "evidence of securities fraud." (Discala Mem. at 12). Discala contends that price fluctuations over 100% in the over-the-counter market are common and attaches a stock price chart of other penny stocks that purportedly support his contention. (Id.)

Discala's argument is without any basis. Special Agent Braconi accurately described in his Wiretap Affidavit the two significant price spikes and declines between May 2013 and September 2013 that resulted from Discala and his co-conspirators' manipulation scheme. Specifically, Special Agent Braconi accurately stated that CodeSmart's share price increased 291 percent from $1.77 on May 13, 2013 to $6.94 on July 12, 2013; dropped by 68 percent to $2.19 on August 21, 2013; spiked to $4.60 on August 30, 2013; and dropped more than 50 percent to $2.13 on September 20, 2013. (Wiretap Affidavit ¶¶ 15, 34). In addition,

Special Agent Braconi cited a wealth of information – including several confidential sources, CodeSmart's reverse merger and false statements, and Discala and his co-conspirators' control of CodeSmart free-trading shares, profitable trading and regular communications – to conclude that the "level of volatility" in CodeSmart shares "is a possible sign of securities fraud."  (Id. ¶ 15). This conclusion was reasonable based on the abundant information Special Agent Braconi had provided establishing probable cause to believe that Discala and his co-conspirators were manipulating CodeSmart's share price.

> d.   Special Agent Braconi Reviewed and Accurately Described
> Discala's Trading Records

Discala also argues that Special Agent Braconi's representations regarding Discala's trading of CodeSmart shares were "demonstrably false."  (Discala Mem. at 10).  First, Discala contends that Special Agent Braconi was not truthful when he stated in the Wiretap Affidavit that he had reviewed Discala's CodeSmart trading records.  (Discala Supp. Mem. at 1-2).  Second, Discala asserts that Special Agent Braconi falsely stated in the Wiretap Affidavit that "[t]rading records show that Discala . . . received free-trading CodeSmart shares when the price of the shares was low and sold a large amount of the shares at times the price peaked." (Discala Mem. at 10) (quoting Wiretap Affidavit ¶¶ 20, 24).  Both of Discala's assertions are baseless.

First, Special Agent Braconi did in fact review Discala's CodeSmart trading records before submitting the Wiretap Affidavit.  Specifically, in February 2014, Special Agent Braconi received from the SEC blue sheet data containing trading in CodeSmart between June 14, 2013 and November 29, 2013.  In addition, in September 2013, Special Agent Braconi had received from the SEC records from the DTCC showing the large number of CodeSmart free-

trading shares that Discala and his co-conspirators received shortly after CodeSmart's reverse merger at approximately $0.02 per share.

Second, the blue sheet data that Special Agent Braconi reviewed did in fact show that Discala sold "a large amount" of his free-trading CodeSmart shares "at times the price peaked." (Wiretap Affidavit ¶¶ 20, 24, 49). Discala claims that between May 22, 2013 and June 24, 2013, he sold more than 830,000 shares at an average price of $3.51 per share. (Discala Mem. at 10). However, the blue sheet data shows very different trading results. The blue sheet data shows that, between May 22, 2013 and June 24, 2013, Discala's accounts sold 498,213 CodeSmart shares for $2,782,944 at an average selling price of $5.59 per share. This $5.59 average price was in fact relatively close to the July 12, 2013 peak price of $6.94, and certainly far higher than the approximately $0.02 per share price at which Discala's accounts purchased the free-trading shares. Accordingly, this trading data shows that Discala made a very large profit – almost $3 million – from selling his free-trading CodeSmart shares close to the peak price as a result of his market manipulation scheme.

Furthermore, Discala's trading after the July 12, 2013 peak until August 21, 2013 demonstrates how he and his co-conspirators profited from their CodeSmart manipulation scheme. Discala claims that after the July 12, 2013 peak of $6.94 until the August 21, 2013 trough of $2.19, he was a net purchaser of 210,000 CodeSmart shares. The blue sheet data shows that Discala's accounts were net purchasers of 210,432 shares after the July 12, 2013 peak until August 21, 2013 at a cost of $1,234,598. However, co-conspirator accounts – including a Craig Josephberg account, three Marc Wexler accounts, a Marleen Goepel account and a Matthew Bell account – were net sellers of 422,563 shares for a profit of $1,312,486 during the same time period. Accordingly, after the July 12, 2013 peak until August 21, 2013, Discala and

51

his co-conspirators made a net profit of $77,888, likely at the hands of investor victims.  In addition, Discala's purchases while his co-conspirators were selling during this period almost certainly reflected, at least in part, match trades that were critical to maintaining the trading volume and price of CodeSmart stock.  Maintaining CodeSmart stock's trading volume and price enabled Discala and his co-conspirators to again artificially inflate the stock price and fraudulently profit, which they did between August 22, 2013 and August 30, 2013.

Indeed, Discala's trading between August 22, 2013 and August 30, 2013 confirms the accuracy of Special Agent Braconi's statement that Discala sold free-trading CodeSmart shares "at times the price peaked."  Specifically, during that period Discala's accounts executed net sales of 253,489 shares for a profit of $615,034.[10]

In sum, Special Agent Braconi's description of Discala's trading in CodeSmart was generally accurate, and in the few instances in which it was not completely accurate, any inaccuracies were inadvertent and immaterial, and Discala's and his co-conspirators' trading

---

[10] In addition, Discala takes issue with Special Agent Braconi's statement that "trading records showed that Discala, Goepel, Bell and their co-conspirators had also profited from selling a number of penny stocks – including Soul & Vibe Interactive Inc. ("Soul"), Location Based Technologies Inc. ("Location") and Mojo Organics Inc. ("Mojo") – that experienced dramatic spikes and declines in their market value."  (Discala Mem. at 11) (citing Wiretap Affidavit ¶ 49 n.7).  Discala then provides what he claims to be profit and loss figures from his trading of the stock of these three companies.  (Id.)  Discala does not, however, state what accounts these figures include or what time period these figures cover, nor does he take into account his co-conspirators' trading in these companies.  (Id.)  Accordingly, the government cannot assess the accuracy of Discala's figures.  Furthermore, the government's analysis of the blue sheet data reflecting trading of Soul shares confirms that Discala and his co-conspirators sold and purchased large numbers of Soul shares during July 2013 and August 2013, reflecting manipulative trading similar to their manipulative trading of CodeSmart.  In any event, given the wealth of information provided in the Wiretap Affidavit demonstrating that Discala and his co-conspirators manipulated CodeSmart shares and Cubed shares, Discala and his co-conspirators' precise trading in Soul, Location and Mojo was not material to the finding of probable cause.

provided further probable cause to believe that Discala and his co-conspirators were

manipulating CodeSmart shares.

> e.    Special Agent Braconi's Description of Cubed's Reporting
>        Requirements Regarding Its Asset Purchase Agreement Was
>        Accurate

Discala argues that Special Agent Braconi "completely mischaracterized" the

SEC filing requirements when he stated his belief that Cubed intentionally misreported its asset

purchase agreement to evade SEC scrutiny.  (Discala Mem. at 16-18.)  Discala contends that

Cubed correctly filed a Form 8-K on March 24, 2014, in which it disclosed its purchase of assets

from Crackpot under Item 1.01, "Entry into a Material Definitive Agreement" ("Item 1.01").

(Id. at 17).  According to Discala, Special Agent Braconi incorrectly and recklessly stated that

Cubed should have instead reported the purchase agreement under Item 2.01, "Completion of

Acquisition or Disposition of Assets" ("Item 2.01").[11]  (Id. at 17-18).

Discala is wrong.  As Special Agent Braconi explained in his Wiretap Affidavit,

significant asset purchases are supposed to be filed under a specific SEC regulation, Item 2.01,

which typically triggers additional scrutiny by the SEC and usually leads to the company having

to file a new Form 10-K, with a thorough accounting of its financial performance and position.

By instead filing under Item 1.01, which governs any entry by a company into a material

agreement, however, Cubed was able to evade the greater SEC scrutiny accompanying a new

Form 10-K filing.  (Wiretap Affidavit ¶ 70).

---

[11] Item 1.01 and Item 2.01 can be found under "Final Rule: Additional Form 8-K
Disclosure Requirements and Acceleration of Filing Date," available at
https://www.sec.gov/rules/final/33-8400.htm#seciic.

At the time of Cubed's asset purchase agreement, Item 1.01 required "the disclosure of material definitive agreements entered into by a company that are not made in the ordinary course of business."  Item 2.01 required "disclosure if a company, or any of its majority-owned subsidiaries, has acquired or disposed of a <u>significant amount of assets,</u> otherwise than in the ordinary course of business." (emphasis added).  Any reasonable reading of these rules makes clear that when Cubed, a shell company with <u>no</u> assets, acquired all of Crackpot's intellectual property assets for $350,000 and more than 2.5 million Cubed shares, an acquisition of a "significant amount of assets" had occurred.  (<u>Id.</u> ¶¶ 70-71).  Accordingly, Cubed was required to report the asset purchase agreement under Item 2.01 and open itself up to greater SEC scrutiny.

Discala argues in the alternative that, because the final installment owed under the purchase agreement was not due until after the March 24, 2014 Form 8-K filing, the acquisition had not closed as of that date and thus Cubed was not required to report under Item 2.01. (Discala Mem. at 18) (quoting Item 2.01 ("Typically, a company will report its entry into a material definitive agreement to acquire or dispose of assets under Item 1.01, and then later disclose the closing of the acquisition or disposition transaction under Item 2.01.")).  This argument strains credulity.  As an initial matter, Cubed reported in the Form 10-Q it filed on April 21, 2014 that it owned Crackpot's assets and was no longer a shell company.  <u>See</u> April 21, 2014 Form 10-Q, attached to Discala's Motion as Ex. M, at F-8.  Thus, Cubed thereby reported to the public that it had, in fact, completed its acquisition of Crackpot's assets.  Furthermore, if the rule was, as Discala asserts, that a company needed to report an acquisition only when the final installment was made, companies could theoretically structure installment payments for a

period of years and thereby avoid SEC reporting requirements.  Accordingly, Discala's argument

holds no water.

> f.    Special Agent Braconi's Statements Regarding the Valuation of
>       Crackpot Intellectual Property Were Accurate and Well-Founded

Discala also argues that Special Agent Braconi mischaracterized the valuation of

the Crackpot intellectual property that Cubed purchased and that "it was only through his

intentionally slanted representations that he was able to give the appearance of a drastic

misalignment in valuation that might give rise to an inference of something improper."  (Discala

Mem. at 18-20).

This argument is baseless and ignores Special Agent Braconi's reasoned analysis

of Cubed's purchase of Crackpot's intellectual property.  Special Agent Braconi stated

accurately that Cubed purchased Crackpot's intellectual property for $350,000 and 2,537,455

shares of Cubed common stock.  (Wiretap Affidavit ¶ 71).  Because Cubed was a penny stock

company with no assets at the time of the asset purchase, Special Agent Braconi reasonably

concluded that Cubed's shares were worth essentially nothing and thus that the intellectual

property assets were worth $350,000 or "at best just slightly more than that amount."  (Id.)

Special Agent Braconi also reasonably concluded that that amount also reflected the value of

Cubed because the Crackpot assets were effectively the only assets Cubed possessed.  (Id.)

Given that Cubed was likely valued at $350,000 or slightly more, Special Agent Braconi

believed that the approximately $148.85 million valuation for Cubed that Morning Star and

Yahoo Finance reported on March 28, 2014 was driven by the fraudulent conduct of Discala and

his co-conspirators.  Supporting this belief was Morning Star's report that the $148.85 million

valuation was calculated based on the $5 price per share paid in a private sale of 200 Cubed

shares.[12]  (Id. ¶ 72).  Based on his training, experience and investigation, Special Agent Braconi reasonably believed that two Cubed insiders made the 200 share trade at an inflated price of $5 in order to cause the inflated valuation of Cubed, and that this inflated valuation marked the beginning of false information disseminated to the public by Cubed insiders to fraudulently inflate the value of Cubed stock.  Id.

*        *        *

Contrary to Discala's contentions, with a few inadvertent and immaterial exceptions, Special Agent Braconi accurately and completely described the wealth of information establishing probable cause that Discala and his co-conspirators had manipulated CodeSmart and were manipulating Cubed, and that wire and electronic communications would contain evidence of those crimes.  Accordingly, Discala's motion for a Franks hearing should be denied.

C.     The Court Should Deny Discala's Motion to Suppress the Wiretap for Lack of Necessity Without a Hearing

Discala argues that the wiretap authorized in this case was unlawful because the Wiretap Affidavit failed to sufficiently show necessity.  Specifically, Discala argues that a wiretap was unwarranted in light of the evidence accumulated by other methods during the course of the investigation, and that a wiretap intercepting only Discala's text messages "would have been far less invasive" and would have "produced the information" the government sought. (Discala's Mem. at 2-6).

---

[12] Morning Star calculated the $148.85 million valuation by multiplying the $5 per share price paid in the private sale of 200 Cubed shares by the more than 25 million then outstanding Cubed shares.

Discala's arguments are unavailing.  The Wiretap Affidavit set forth in detail the techniques law enforcement used in the course of the investigation before seeking wiretap authorization and why those techniques were not adequate to accomplish the objectives of the investigation.  After reviewing the Wiretap Affidavit, Judge Castel signed the Wiretap Order, pursuant to 18 U.S.C. § 2518, authorizing the interception of wire and electronic communications over the Discala Telephone.  As such, the Wiretap Affidavit met the statutory requirements of Title III.

1.    Title III's "Necessity Requirement"

Along with establishing probable cause, an application for a wiretap must include, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c); see also Rajaratnam, 719 F.3d at 144-45 (observing that Title III requires supporting Wiretap Affidavits to establish both probable cause and that the wiretap is necessary to achieve the goals of the investigation).  Similarly, in granting an application for a wiretap, the issuing judge must determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed or to be too dangerous."  18 U.S.C. § 2518(3)(c).

Section 2518(3)(c), commonly referred to as the "necessity requirement," does not require that a wiretap be the exclusive avenue to conduct an investigation.  Instead:

> [T]he purpose of the statutory requirements . . . is not to preclude resort to wiretapping until after all other possible means of investigation have been exhausted by investigative agents; rather, [the statute] only require[s] that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

57

United States v. Diaz, 176 F.3d 52, 111 (2d Cir. 1999) (quoting United States v. Torres, 901 F.2d

205, 231 (2d Cir. 1990)); United States v. Concepcion, 579 F.3d 214, 218 (2d Cir. 2009); United

States v. House, 636 Fed. Appx. 50, 52 (2d Cir. 2016).  Further, the statute does not require "that

any particular investigative procedures be exhausted before a wiretap may be authorized."

United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (citations omitted) (emphasis

added); United States v. Lilla, 699 F.2d 99, 104 (2d Cir. 1983) (same).

At most, the applicant for a wiretap must demonstrate only that normal

investigative techniques would prove difficult in exposing the full extent of the criminal activity,

not that they would be doomed to failure.  See United States v. Scala, 388 F. Supp. 2d 396, 404

(S.D.N.Y. 2005) ("[A] reasoned explanation, grounded in the facts of the case, and which

squares with common sense, is all that is required . . . .") (citations omitted).  "Merely because a

normal investigative technique is theoretically possible, it does not follow that it is likely.  What

the provision envisions is that the showing be tested in a practical and commonsense fashion."

Concepcion, 579 F.3d at 218 (quoting S. Rep. No. 90-1097 (1968), as reprinted in 1968

U.S.C.C.A.N. 2112, 2190).

"[W]hen considering a motion to suppress" alleging a failure to show necessity,

"the authorizing judge's determination is entitled to substantial deference."  United States v.

Labate, No. 00-CR-632 (WHP), 2001 WL 533714, at *13 (S.D.N.Y. May 18, 2001) (citing

Torres, 901 F.2d at 231); see also United States v. Gotti, 42 F. Supp. 2d 252, 262 (S.D.N.Y.

1999) (a reviewing court's determination as to whether this requirement has been met "is not de

novo, but is limited to determining whether [the issuing] judicial officer had a 'substantial basis'

for her determination").  Indeed, "the trial court reviews the wiretap application only to

determine whether the facts set forth by the Government were 'minimally adequate' to support

the issuing court's order."  United States v. Bourne, No. 08-CR-888 (NGG), 2011 WL 4458846,

at *11 (E.D.N.Y. Sept. 23, 2011) (quoting Concepcion, 579 F.3d at 217).

        2.      The Wiretap Affidavit Exceeds Title III's "Necessity Requirement"

        Here, there was a substantial basis for Judge Castel's decision to issue the Wiretap

Order because the facts set forth in the Wiretap Affidavit were more than sufficient to meet the

standard of being "minimally adequate" to support the Wiretap Order.  Concepcion, 579 F.3d at

217.  The Wiretap Affidavit set forth the other investigative means considered by the

government and indicated why they could not be expected to achieve the government's

investigative objectives.

        The Wiretap Affidavit described in detail many techniques that had already been

tried – but ultimately failed – to further the investigation's objectives, including the use of three

confidential sources, information from victims, search warrants for emails and text messages,

location data, pen registers, trap and trace devices, criminal database checks and parallel

investigations.  (Wiretap Affidavit ¶¶ 116-20, 126-28, 133-34, 139-40).  The Wiretap Affidavit

also described those techniques that reasonably appeared likely to fail to achieve the goals of the

investigation, including undercover agents, physical surveillance, grand jury subpoenas for

testimony, interviews of targets, trash searches and mail covers, and explained why that was the

case.  (Id. ¶¶ 121-25, 129-32, 137-38).  Accordingly, Judge Castel authorized interception of the

Discala Telephone "until all communications are intercepted which reveal fully the manner in

which the [Target Interceptees] and others as yet unknown are committing the offenses

described[,] the identities of their confederates, their places of operation, and the nature of the

conspiracy involved therein," or for a 30-day period measured from the first date of interception,

whichever was earlier.  (Wiretap Order at 4).

Notwithstanding these undisputed facts, Discala argues that the government's "resort to a wiretap application was unnecessary" and that the government thus failed to satisfy the requirements of 18 U.S.C. § 2518.  (Discala Mem. at 3).  The gravamen of Discala's argument is that the Wiretap Affidavit did not establish "necessity" because "intercepting Discala's text messages would have been far less invasive" and "the targeted interception of text messages could have produced the information [the government] sought."  (Id. at 3-4).  Discala asserts that at the time the government applied for the Wiretap, it had identified many, if not all, of the phone numbers Discala was contacting in furtherance of the alleged scheme, and the government knew that text messages were Discala's "preferred means of communication" because "a large portion" of Discala's communication with his alleged co-conspirators was via text message.  (Id. at 4).  Discala states that Special Agent Braconi "knew that he could have uncovered a significant amount of information in a less invasive Text Message Warrant" and thus the "unfettered and highly intrusive interception of Mr. Discala's phone conversations was neither necessary nor reasonable."  (Id.).  In addition, Discala argues that Special Agent Braconi's concern that he might not be able to obtain Discala's past text messages through a search warrant was a "specious device in order to jump directly to the sweeping and unjustified authority he sought in the Wiretap Affidavit.  He did not demonstrate that such broad authority was necessary because it simply was not."  (Id. at 5-6).  Accordingly, Discala argues that the contents of his telephone conversations should be suppressed and removed from any analysis of the Wiretap Extension Affidavit and the OmniView search warrant affidavit.  (Id. at 6).

Discala's arguments are without merit.  As an initial matter, Discala misunderstands what the "necessity requirement" of Title III entails.  18 U.S.C. § 2518(1)(c) requires only "a full and complete statement as to whether or not other investigative procedures

have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to

be too dangerous." As described above, the Wiretap Affidavit met these requirements with

respect to a host of other investigative procedures, including text messages. (Wiretap Affidavit

¶¶ 116-40). Special Agent Braconi stated that searches of text messages had not been sufficient

to accomplish the goals of the investigation. (Id. ¶ 127). He explained that some telephone

service providers – including New Cingular Wireless PCS, the service provider for the Discala

Telephone – did not store any text messages.[13] Thus, no text message search warrant would

detail all of the communications between Discala and his co-conspirators. Moreover, Special

Agent Braconi explained that the service providers that did store text messages did not have a

consistent policy on storage and could not guarantee the completeness of their message data

storage. In addition, it took at least a week to get any text messages in response to a search

warrant. For these reasons, text message search warrants would not allow agents to uncover the

entirety of the scheme, identify all the co-conspirators or provide sufficient evidence to build a

strong case against the co-conspirators. (Id. ¶¶ 127-28).

A wiretap warrant intercepting only text messages – not telephone call content –

would also have been insufficient to accomplish the goals of the investigation because Discala

and his co-conspirators were more likely to communicate openly regarding their illegal conduct

during a telephone call than by text message. Special Agent Braconi noted that co-conspirators

whose emails the government had obtained via search warrant "showed that they [we]re cautious

---

[13] The government obtained several incriminating text messages between Discala and
Wexler and between Discala and Bell through lawfully-authorized search warrants of Wexler's
and Bell's telephones' text messages, respectively. (Wiretap Affidavit ¶¶ 78-88). The
government did not seek a search warrant to obtain Discala's historical text messages, however,
because the telephone carrier, New Cingular Wireless PCS, informed the government that they
did not store text messages. (Id. ¶ 127).

when communicating via email and d[id] not discuss the financial transactions at issue in this investigation." (Id. ¶ 126).  For example, CodeSmart CEO Ira Shapiro stated in an email to an associate:  "We need to put an end to long emails[;] phone conversations are better."  (Id.).  The text messages Special Agent Braconi described in the Wiretap Affidavit demonstrated a similar cautiousness by the co-conspirators in discussing their illegal conduct.  For example, after speaking to an associate who had apparently learned of Discala's and his co-conspirators' intention to control and manipulate Cubed shares, Discala wrote to Wexler: "He just said I just talked to mark and kyleens a genius our 8m shares we control.  I'm like what the funk are you talking about.  We only got 5.5m and gave a lot back from there.  And NO ONE CONTROLS NOTHING.  THE DUDES SCARY BRO.  EVEN THOUGH WE DO IT ALL RIGHT HE FREAKS ME OUT."  (Id. ¶ 82).  Wexler similarly responded:  "He's makin shit up at this point begging for money . . . ."  (Id.).  In this text message exchange, Discala and Wexler were both clearly concerned about creating a record in which they were admitting to their control of Cubed shares, so they denied it instead.  By contrast, a review of the pertinent calls described in the Wiretap Extension Affidavit that were recorded during the first 30 days of the Wiretap demonstrates how much more open and thorough Discala and his co-conspirators were in discussing their illegal conduct during a telephone call than they were by text message. [14]  (See Wiretap Extension Affidavit ¶¶ 20-35).

---

[14] Discala also argues that the fact that CS1 provided information regarding Discala on March 14, 2014 – 47 days before the May 1, 2014 Wiretap Affidavit – prevented Special Agent Braconi from satisfying the "necessity" requirement.  (Discala Supp. Mem. at 2).  This argument has no legal or logical basis.  The Wiretap Affidavit accurately disclosed when CS1 provided information to the government and clearly met the "necessity" requirement by setting forth the other investigative means considered by the government and indicating why they could not be expected to achieve the government's investigative objectives.  Furthermore, Discala's demand for production of the 302s from CS1's interviews with the government on the basis that CS1

In sum, as clearly set forth above, the Wiretap Affidavit, which was approved by Judge Castel and, thus, is entitled "substantial deference," Labate, 2001 WL 533714, at *13, far exceeds the applicable standard that the facts set forth by the government be "'minimally adequate' to support the issuing court's order." Bourne, 2011 WL 4458846, at *11.  Therefore, the Court should reject Discala's motion to suppress the evidence obtained by the wiretap and to remove it from the Wiretap Extension Affidavit and the OmniView search warrant affidavit based on the government's alleged failure to show "necessity" for the wiretap.

D.     The Court Should Deny Discala's Motion to Suppress the Wiretap for Violating Minimization Requirements Without a Hearing

Discala argues that "the vast majority" of calls and text messages the government intercepted and recorded were not relevant, and the government "did not articulate or employ any meaningful yardstick" for determining relevancy.  (Discala Mem. at 7).  As discussed below, Discala is wrong on both fronts.  The government provided clear and proper minimization instructions to the FBI agents who monitored the wiretap and the agents consistently followed those instructions.

1.     Title III's "Minimization Requirement"

Title III provides that every court order authorizing a wiretap "shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). The existence of a minimization violation "turns on an objective assessment of the officer's

---

once served as an attorney for Discala or one of his companies is meritless and has no bearing on Discala's suppression motion.  It is the government's understanding that any information from CS1 that Special Agent Braconi included in his Wiretap Affidavit was not protected by the attorney-client privilege because it did not consist of confidential legal advice or was subject to the crime-fraud exception.

actions in light of the facts and circumstances confronting him at the time."  Scott v. United

States, 436 U.S. 128, 136-37 (1978).  The Court stressed the fact-intensive nature of such an

inquiry:

> Because of the necessarily ad hoc nature of any determination of
> reasonableness, there can be no inflexible rule of law which will
> decide every case.  The statute does not forbid the interception of
> all nonrelevant conversations, but rather instructs the agents to
> conduct the surveillance in such a manner as to 'minimize' the
> interception of such conversations.  Whether the agents have in
> fact conducted the wiretap in such a manner will depend on the
> facts and circumstances of each case.

Id. at 139-40.

The Court also cautioned against "blind reliance on the percentage of

nonpertinent calls intercepted," explaining that the focus should instead be on "the circumstances

of the wiretap":

> [I]t may be important to determine at exactly what point during the
> authorized period the interception was made.  During the early
> stages of surveillance the agents may be forced to intercept all calls
> to establish categories of nonpertinent calls which will not be
> intercepted thereafter.  Interception of those same types of calls
> might be unreasonable later on, however, once the nonpertinent
> categories have been established and it is clear that this particular
> conversation is of that type.  Other situations may arise where
> patterns of nonpertinent calls do not appear.  In these
> circumstances it may not be unreasonable to intercept almost every
> short conversation because the determination of relevancy cannot
> be made before the call is completed.

Id. at 140-41.

Courts applying Scott's "objective reasonableness standard" have evaluated the

government's minimization efforts "in the context of the entire wiretap, as opposed to a chat-by-

chat analysis."  United States v. Goffer, 756 F. Supp. 2d 588 (S.D.N.Y. 2011); United States v.

Menendez, No. 04-CR-219 (DAB), 2005 WL 1384027, at *3 (S.D.N.Y. June 8, 2005).  "'[T]he

mere fact that every conversation is monitored does not necessarily render the surveillance

violative of the minimization requirement of the statute . . . . [N]o electronic surveillance can be

so conducted that innocent conversation can be totally eliminated.'"  United States v. Salas, No.

07-CR-557 (JGK), 2008 WL 4840872, at *6 (S.D.N.Y. Nov. 5, 2008) (quoting United States v.

Bynum, 485 F.2d 490, 500 (2d Cir.1973)).  Indeed, courts have found that minimization "is

generally inapplicable to calls of less than two minutes in duration because they are 'too brief a

period for an eavesdropper even with experience to identify the caller and characterize the

conversation.'"  Menendez, 2005 WL 1384027, at *3 (quoting United States v. Capra, 501 F.2d

267, 275–76 (2d Cir.1974)).

       The government has the burden of showing compliance with the minimization

requirements of Title III.  See United States v. Rizzo, 491 F.2d 215, 217 n. 7 (2d Cir.1974).

"Once a prima facie showing is made, the burden shifts to the defendant to show that, despite a

good faith compliance with the minimization requirements, a substantial number of non-pertinent

conversations have been intercepted unreasonably."  United States v. Rajaratnam, No. 09-CR-

1184 (RJH), 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010).

       2.     The FBI Agents Monitoring the Wiretap Complied with Title III's
             Minimization Requirements

       Discala asserts that "the vast majority" of calls and text messages intercepted and

recorded by the government over the course of the wiretap "had nothing whatsoever to do with

the alleged wire fraud and share price manipulation scheme, and that many of these seized

communications "even had to do with health issues and Mr. Discala's wife's pregnancy."

(Discala Mem. at 7).  Discala contends that "[t]his fact confirms that the government did not

articulate or employ any meaningful yardstick for determining relevancy in service of its

minimization obligation before, during or after interception."  (Id.).

Discala's contentions have no support in the record.  As an initial matter, in compliance with 18 U.S.C. § 2518(5), the Wiretap Order provided that "all monitoring of wire and electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation, in accordance with the minimization requirements of Chapter 119 of Title 18, Unites States Code."  (Wiretap Order at 10).  Furthermore, before commencing with monitoring the wiretap, FBI agents received specific instructions from the government regarding Title III's minimization requirements.  The FBI agents consistently followed these instructions during the two 30-day periods in which they monitored the wiretap – namely, between May 2, 2014 and June 29, 2014.

The FBI's compliance with Title III's minimization requirements is confirmed by the intercepted communications and the line sheets that the government produced to the Defendants.  Between May 2, 2014 and June 29, 2014, FBI agents intercepted 4,210 calls and 15,926 text message sessions made or received by the Discala Telephone.  Of the intercepted calls and text messages, the FBI deemed 1,179 calls and 9,299 text message sessions to be pertinent.  On August 29, 2014, the government produced 1,160 recordings of pertinent intercepted calls[15] and approximately 9,248 pertinent text message sessions[16] from the Discala

_____

[15] Discala mistakenly states in his motion that in "its first discovery production, the government provided 1,160 recordings of intercepted calls, yet failed to identify which were 'pertinent' (and without articulating the standard it applied to make this determination)." (Discala Mem. at 8).  In fact, those 1,160 recordings were only of pertinent calls.

[16] The government recently determined that apparently 9,299 – not 9,248 – text message sessions were deemed pertinent.  The government is still determining whether there are, in fact, 51 pertinent text message sessions that have not yet been produced to the Defendants; if so, the government will produce those pertinent text message sessions as soon as possible.

Telephone.  On October 15, 2014, the government produced the line sheets that related to the 1,160 pertinent calls produced on August 29, 2014.  And on March 11, 2016, the government produced the line sheets related to all 4,210 intercepted calls on the wiretap, as well as six additional pertinent calls.[17]

The pertinent call recordings and the produced line sheets clearly demonstrate that Discala's claim that "the vast majority" of intercepted calls and text messages "had nothing whatsoever to do" with Discala's stock manipulation schemes is completely baseless. Approximately 58 percent of the intercepted text messages were deemed pertinent.  Of the non-pertinent telephone calls, some calls did not have audio while others had no content because one participant hung up before the conversation commenced.  Of the non-pertinent calls that contained content, FBI agents consistently followed Title III's minimization requirements.

Furthermore, the line sheets confirm that conversations with Discala's wife, Dounya Discala, were often recorded because the content of Discala's conversations with her often involved potentially illegal conduct.  Indeed, as the managing member of Discala's company, Fidelis, Dounya Discala often discussed potentially illegal activity with Discala, including moving money among suspicious accounts.  See, e.g., Session 3609 (Abraxas Discala ("AD"): "so you gotta do me a favor and not get mad at me. Ok. You gotta send Chris Grubb $2,500 bucks, wait for (Inaudible), shut off, all that stuff, we own his case, we own the whole thing. and then move my money over to you."  Dounya Discala ("DD"): "I cant move your

---

[17] In addition, on November 17, 2017, the government produced 16 additional pertinent call recordings.  The line sheets for these calls were produced on March 11, 2016.  The government recently realized that 1,179 intercepted calls had been deemed pertinent, and that three of the 1,166 pertinent calls previously produced were in fact not pertinent.  Accordingly, the government today produced recordings of the remaining 16 pertinent calls.

money over to me because your accounts are locked. You need to call remember." AD: "I tried to do it, BoA opens at 9am." DD: "no worries, we do it later"); Session 3662 (AD: "hello my love, i just wanted to make sure you saw that, want to make sure you wire the money to the right place." DD: "oh I did not check it. I will check right now").

In addition, in several calls between Discala and co-conspirators (or potential co-conspirators), he discussed his wife sending agreements and wiring money to them. See, e.g., Session 2343 (Unidentified Male ("UM"): "What does a distribution mean? Clue me in here". AD: "Did she get 10 thousand shares? I don't even know what she had. It's a PTA, I'll have my wife send it to you"); Session 3653 (AD to Darren Goodrich: "On SSET um they have about 24.5 million in assets, in movie assets, right, life of crime, the butler, they owe me some debt, not a lot, 350 grand, but its a steal down there and I think thats why they are trying to do it. um, so if we can stay above that 5 cent guy, (inaudible) 50 thousand at 5 cents or something, we can go 5.001, or 5.01 and collect the crap out of them, me you and mark lets take this thing. Its literally literally there for the taking for us, and I'll explain it to you and um, my wife will get a wire out to john today. but this is a real company with 24.5 million in assets"); Session 4590 (AD: "Hey buddy stay up there with size and have Mitch, my wife's at the bank sending you guys money. But I just want to collect everything I can here. I just want to stay above Knight. Same size 10,000. Stay above them").

Moreover, in the instances in which Discala and his wife discussed purely personal issues – such as health issues or Discala's wife's pregnancy – the monitoring FBI agents properly followed minimization protocols. See, e.g., Sessions 1328 (minimized call lasting two and a quarter minutes); 8112 (minimized call lasting less than 2 minutes); 9812

(minimized call lasting less than one minute); 12758 (minimized call lasting two and a half minutes).

Because the FBI agents monitoring the wiretap consistently complied with Title III's minimization requirements, Discala's motion to suppress on minimization grounds should be denied.[18]

## VII.   THE COURT SHOULD DENY DISCALA'S MOTION TO SUPPRESS THE FRUITS OF THE OMNIVIEW SEARCH WITHOUT A HEARING

Discala moves to suppress all evidence seized during the search of the OmniView Premises, including six boxes of hard-copy documents and the information obtained from seized computers and servers.  Discala challenges the probable cause for the search warrant, as well as the warrant's breadth and particularity.  Discala also requests a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).  None of Discala's arguments have merit: they do not provide an adequate basis to overcome the substantial deference due the magistrate judge's findings and they do not meet the burden necessary to hold an evidentiary hearing.

---

[18]   The cases Discala cites in support of his motion to suppress on minimization grounds involved "a blatant disregard" for Title III's requirements, and are thus clearly distinguishable from this case.  See United States v. Hyde, 574 F.2d 856, 869 (5th Cir. 1978) ("If the minimization requirement is blatantly disregarded, the information obtained through the wiretap may be suppressed."); United States v. Principie, 531 F.2d 1132, 1140-41 (2d Cir. 1976) (suppressing only those conversations that were seized in violation of the time limitation in the order because "the violation of the order was by its nature blatant and apparently extensive as well"); United States v. Simels, No. 08–CR–640 (JG), 2009 WL 1924746, at *14 (E.D.N.Y. July 2, 2009) ("[N]o part of any conversation, pertinent or nonpertinent, was monitored to ensure minimization, because no monitoring was conducted at all. Therefore, all of the interceptions in this case were not made in conformity with the order of authorization and shall accordingly be suppressed.") (internal quotations omitted).

A.    The Search of OmniView and Arrests

On or about July 15, 2014, the Honorable Holly B. Fitzsimmons, United States

Magistrate Judge for the District of Connecticut, signed a warrant authorizing the search of

OmniView's office located at 140 Rowayton Ave., Suite C, Norwalk, Connecticut 06853 (the

"OmniView Premises").  Judge Fitzsimmons signed the warrant (the "OmniView Warrant') after

reviewing Special Agent Braconi's affidavit dated July 15, 2014 (the "OmniView Affidavit" or

"OmniView Aff.").

As described on the face of the OmniView Warrant, federal agents were

authorized to seize from the OmniView Premises "evidence, fruits and instrumentalities of

violations of Title 18, United States Code, Sections 371, 1341, 1343 and 1349, and Title 15,

United States Code, Sections 78j(b) and 78ff, as set forth in Attachment B."  Attached to and

incorporated by reference into the OmniView Warrant were: Attachment A, a description of the

OmniView Premises; and Attachment B, a description of the property to be seized, which

included computers and other electronic storage media.  A copy of the Indictment in this case,

which had been returned by a grand jury on July 14, 2014, was also provided to Magistrate Judge

Fitzsimmons.

On July 17, 2014, the same day that law enforcement agents executed the arrest

warrants for Discala, Shapiro, Wexler, Bell, Josephberg, Cane and Azrak, the search of the

OmniView Premises was conducted.  FBI agents began the search at approximately 6:30 am, and

70

concluded approximately three hours later.  The agents seized approximately six boxes of hard-copy documents[19] and over a dozen electronic items.

Of the seized electronic items, approximately nine of those items were later imaged off-site by the FBI's Computer Analysis Response Team ("CART"), including desktop computers and two servers.[20]  Copies of the images were provided to defense counsel on October 30, 2014, and the seized electronic items were returned to the defendant at his request in May 2016.[21]

Due to the large amount of data that was contained on the electronic items that CART imaged, the government conferred with defense counsel regarding an agreed upon list of search terms which were then used to cull responsive documents.  With these documents, the government attempted to filter out potentially privileged documents based on a list of attorney names provided by defense counsel and remove documents that predated February 2012.[22]  After these searches were completed, the documents were produced in discovery in an electronic load

---

[19] The defendant personally, with his counsel, conducted a privilege review of these boxes on August 29, 2014, and copies of anything that was not designated privileged were later provided in discovery on January 6, 2015.

[20] Two seized items, a computer and a server, seized from the OmniView Premises were returned on July 23, 2014, without being imaged, to a neighboring business which claimed it owned those items.  In addition, CART did not extract data from a seized Micro-SD card, blackberry cell phone and Ipod, which were returned to Discala.

[21] The government sought and received Court permission for CART to retain a forensic copy of the imaged items in the event that authentication issues arise at trial.

[22] It does appear that the search protocols used were unable to successfully exclude every document that appears to predate February 2012.  However, the government does not intend to use any document seized from OmniView that falls outside the scope of the search warrant.

71

file.  The parties entered into two Stipulations regarding privilege issues that might arise regarding this data.

       B.    <u>The OmniView Affidavit</u>

       By mid-July 2014, the FBI had been investigating Discala and his co-conspirators for an extended period of time.  Many of the facts laid out in the OmniView Affidavit relating to the stock manipulation schemes were included in the Wiretap Affidavit discussed above. However, during the 10 weeks that passed between the signing of the initial wiretap affidavit on May 1, 2014, and preparation of the OmniView Affidavit, the government made significant progress in its investigation.  On July 14, 2014, a grand jury indicted Discala, Wexler, Shapiro, Bell, Josephberg, Cane and Azrak for the crimes listed on the OmniView Warrant and they were arrested on July 17, 2014, the same day the search was executed.

       Facts described in the OmniView Affidavit, which were not included in the Wiretap Affidavit, included, among other things, additional detail about the First Independence /CodeSmart reverse merger and the transfer of all the free-trading shares to individuals and entities connected to Discala, (OmniView Aff. ¶ 8), additional analysis of CodeSmart trading data, (OmniView Aff. ¶¶ 28, 32, 34), that CodeSmart shares held and traded in the name of Discala's administrative assistant, in fact, belonged to Discala, (OmniView Aff. ¶ 27), the government identified an additional false press release relating to Ramapo College issued by CodeSmart on June 4, 2013 (OmniView Aff. ¶ 15), and the government identified another misleading SEC filing, specifically an August 27, 2013 announcement that CodeSmart's CEO, Shapiro, had purchased 25,000 shares of CodeSmart's stock from the public market at $3.21 per share for a cost of $80,250 in a SEC Form-8K filing which failed to disclose that this purchase was funded by Discala.  (OmniView Aff. ¶ 19).

In addition, the OmniView Affidavit contained additional information about the Cubed stock manipulation that was not contained in the Wiretap Affidavit.  By reviewing trading data, the government learned that, from April 22, 2014 through April 30, 2014, of the 57,088 shares of Cubed bought during this period, 32,000 of them were bought through Josephberg's assistant at Meyers Associates.  (OmniView Aff. ¶ 41).  Also, trading data showed that the Cubed stock price moved up from $5.00 per share on March 28, 2014 to $6.70 on July 2, 2014. (Id.).

The OmniView Affidavit also describes approximately a dozen calls intercepted over the Discala Wiretap that clearly showed the ongoing manipulation of Cubed stock by Discala and others.  (OmniView Aff. ¶¶ 52-59).  In these calls, Discala directed others to purchase Cubed stock at specific prices, and discussed how Cane put an "escrow" arrangement in place to control Cubed's stock price.  The calls also showed that Cane was working on marketing and investor relations, and that Discala was going to enter into an agreement with Cubed to buy software "because these guys can't generate revenue, so I'm going to generate it myself."  (Id.)  There are also a series of calls on May 23, 2014 between Discala, Cane and Wexler relating to a situation in which Cubed's stock price went too high and they agreed to bring it back down.  (OmniView Aff. ¶¶ 58).

C.     The OmniView Search Warrant Is Legally Sound

The OmniView search warrant is supported by detailed probable cause statements, and is particularized.  Because the crimes described in the OmniView Affidavit are complex, wide-ranging, and pervasive to OmniView's alleged business, the OmniView Warrant, correspondingly, calls for the seizure of many documents and records. This is appropriate, and fully compliant with the Fourth Amendment.  Furthermore, even, assuming arguendo, that the

warrant was somehow defective, which it was not, the good faith doctrine would preclude suppression in this case.

    D.    <u>Legal Standard for Search Warrants</u>

        The Warrants Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

    1.    <u>Probable Cause</u>

        Probable cause is a "flexible, common-sense standard," <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983), which requires a case-by-case analysis of the totality of the circumstances, <u>see Illinois v. Gates</u>, 462 U.S. 213, 230 (1983).  A valid search warrant rests on a proper finding that probable cause exists to believe (1) that a crime has been committed, and (2) that evidence or instrumentalities of the crime will be found in the place to be searched.  <u>See United States v. Travisano</u>, 724 F.2d 341, 346 (2d Cir. 1983); <u>see also Warden v. Hayden</u>, 387 U.S. 294, 307 (1967) (warrant may be issued to search for anything where there is a connection "between the item to be seized and criminal behavior").  While probable cause requires more than generalized suspicion, it "does not require a prima facie showing" of criminality.  <u>United States v. Martin</u>, 426 F.3d 68, 76 (2d Cir. 2005).  Nor does probable cause require that something be more likely than not.  Instead, probable cause may be established by a mere "probability or substantial chance of criminal activity."  <u>United States v. Bakhtiari</u>, 913 F.2d 1053, 1062 (2d Cir. 1990).  Review for existence of probable cause is not <u>de novo</u>; "[a] magistrate's determination of probable cause should be paid great deference by reviewing courts." <u>United States v. Smith</u>, 9 F.3d 1007, 1012 (2d Cir. 1993) (quotation marks and citations omitted); <u>see also Illinois v. Gates</u>, 462 U.S at 236. "[T]he duty of a reviewing court is simply to ensure that the magistrate

had a 'substantial basis for conclud[ing]' that probable cause existed." <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960).

      2.     <u>Particularity and Breadth</u>

      The particularity requirement of the Warrants Clause, which is distinct from the probable cause requirement, "guards against general searches that leave to the unguided discretion of the officers executing the warrant the decision as to what items may be seized." <u>United States v. Riley</u>, 906 F.2d 841, 844 (2d Cir. 1990); <u>see also</u> <u>United States v. Clark</u>, 638 F.3d 89, 94 (2d Cir. 2011) ("Particularity concerns frequently arise in circumstances where the description in the warrant of the place to be searched is so vague that it fails reasonably to alert executing officers to the limits of their search authority[.]").  The requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items that the magistrate judge has authorized him or her to seize.  <u>See</u> <u>Groh v. Ramirez</u>, 540 U.S. 551 (2004); <u>United States v. Rosa</u>, 626 F.3d 56, 58 (2d Cir. 2010).

      To satisfy the particularity requirement, the crime or crimes under investigation generally should be apparent from the face of the warrant.  <u>United States v. Galpin</u>, 720 F.3d 436, 445 (2d Cir. 2013) ("[A] warrant must identify the specific offense for which the police have established probable cause."); <u>United States v. Vilar</u>, No. 305-CR-621 (KMK), 2007 WL 1075041, at *22 (S.D.N.Y. 2007) ("warrants are generally found to be insufficiently particular where 'nothing on the face of the warrant tells the searching officers for what crime the search is being undertaken' ") (quoting <u>George</u>, 975 F.2d at 76).  In this regard, however, a warrant that calls for seizure of "all evidence" of a given crime or crimes is sufficiently particular if it offers a list of illustrative items.  <u>See</u> <u>Riley</u>, 906 F.2d at 844-45 (warrant containing list of illustrative items to seize was sufficiently particular notwithstanding provision allowing, as well, seizure of "other items that constitute evidence of the offenses" identified); <u>United States v. Young</u>, 745

F.2d 733, 759-60 (2d Cir. 1984) (warrant allowing seizure of listed items plus "other evidence of the crimes specified was sufficiently particular"); United States v. Lustyik, 57 F. Supp. 3d 213, 227-28 (S.D.N.Y. 2014) (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by phrase "including but not limited to"); United States v. Jacobson, 4 F. Supp. 2d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants.").

The broader the crime or crimes under investigation, the broader the categories of documents and records that may properly be seized.  See, e.g., Jacobson, 4 F. Supp. 2d at 522 (breadth of warrant, which contained no timeframe limitation, was justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); United States v. Levy, No. 11-CR-62 (PAC), 2013 WL 664712, at *8 (S.D.N.Y. 2013) (in pump-and-dump case, broad warrant with no timeframe limitation was justified by breadth and complexity of fraud described in underlying affidavit); United States v. Dupree, 781 F. Supp. 115, 149 (E.D.N.Y. 2011) ("The nature of the crime . . . may require a broad search," such as where "complex financial crimes are alleged"); United States v. Hernandez, No. 09-CR-625 (HB), 2010 WL 26544, at *9 (S.D.N.Y. 2010) (broad warrant with no timeframe limitation justified by complexity of investigation); United States v. Cohan, 628 F. Supp. 2d 355, 362 (E.D.N.Y. 2009) ("the degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated") (quotation marks, citation, and alteration omitted).

Indeed, where there is probable cause to believe that a business under investigation is "'pervaded' or 'permeated' with fraud, broad language used in a search warrant will not offend the particularity requirement." D'Amico, 734 F. Supp. 2d at 360 (emphasis added) (quoting U.S. Postal Serv. v. C.E.C. Servs., 869 F.2d 184, 187 (2d Cir. 1989)); United States v. Feng Ling Liu, No. 12-CR-934 (RA), 2014 WL 101672, at *7 (S.D.N.Y. 2014) (applying "all records" doctrine to uphold warrant against particularity and overbreadth challenges); Hernandez, 2010 WL 26544, at *10 (same); United States v. Bowen, 689 F. Supp. 2d 675, 683 (S.D.N.Y. 2010) ("The all records exception allows for the seizure of all of an enterprise's records when the enterprise is primarily engaged in unlawful activity and sufficient evidence is presented of the pervasiveness of that unlawful activity within the enterprise."); United States v. Abboud, 438 F.3d 554, 575 (6th Cir. 2006) ("In a business fraud case, the authorization to search for general business records is not overbroad.").  In such a case, "it is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud."  United States v. Burke, 718 F. Supp. 1130, 1139 (S.D.N.Y. 1989); Feng Ling Liu, 2014 WL 101672, at*7. "Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg.'" Burke, 718 F. Supp. at 1139 (citation omitted); see D'Amico, 734 F. Supp. 2d at 360-61 (applying "all records" doctrine even though government acknowledged business had some "legitimate activity").

### 3.     Good Faith Exception to Suppression

Even if a warrant lacks probable cause or particularity, or is overbroad, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." Herring v. United States, 555 U.S. 135, 140 (2009). In fact, exclusion should be a "last resort" rather than a "first impulse." Id.  Thus, suppression will not be warranted where the

evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  United States v. Leon, 468 U.S. 897, 922 (1984).

Although the burden is on the government to establish good faith, "[searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." Id.  Accordingly, in light of this exception, "[m]ost searches will be upheld." United States v. Rickard, 534 F. App'x 35, 37 (2d Cir. 2013) (summary order).  Only if one of the following circumstances obtains will the searching officers' good faith not have been established:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

Clark, 638 F.3d at 100 (quotation marks and citations omitted).  The "so lacking in indicia of probable cause" concern "most frequently arises when affidavits are bare bones, i.e., totally devoid of factual circumstances to support conclusory allegations." Id. at 103.  "At the opposite end of the spectrum are cases in which a defective warrant issued based on an affidavit providing detailed factual allegations in support of probable cause." Id. "Such cases almost invariably demonstrate reasonable reliance." Id.

Finally, even if a court finds that the searching officers' reliance on the warrant was unreasonable for one or more of the reasons identified above, suppression still will not be warranted if there is an absence of deliberate, culpable conduct: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Herring,

78

555 U.S. at 144; see also Rosa, 626 F.3d at 66 (emphasizing that suppression will not be

warranted, even if standards for overcoming qualified immunity are met, absent evidence of

deliberate and culpable behavior by law enforcement agents).

> E.   There is No Merit to Discala's Motion to Suppress the Fruits of the OmniView
>      Search

>> 1.   The OmniView Affidavit Was Not Misleading and no *Franks* Hearing is
>>      Merited

Discala claims that the OmniView Affidavit contained material

misrepresentations and omissions, and drew conclusions and inferences from the facts that were

not reasonable.  As a result, Discala claims Magistrate Judge Fitzsimmons was misled in finding

that there was probable cause to search the OmniView Premises.  Discala also demands a Franks

hearing.  As discussed above, "[the] Franks standard is a high one."  Rivera v. United States, 928

F.2d 592, 604 (2d Cir. 1991).  A defendant must show a (1) "substantial preliminary showing

that a false statement knowingly and intentionally, or with reckless disregard for the truth, was

included by the affiant in the warrant affidavit" and that (2) "the allegedly false statement is

necessary to the finding of probable cause."  See Franks, 438 U.S. at 155-56; see also United

States v. Martin, 426 F.3d 68, 73-74 (2d Cir. 2005).  The requirement of a substantial

preliminary showing was deemed necessary to prevent the misuse of a veracity hearing for

purposes of discovery or obstruction.  See Gates, 438 U.S. at 171.  As discussed below, there is

no merit to any of Discala's claims and he has not, and cannot, meet the required standard for a

Franks hearing.

> a.   Press Releases and SEC Filings

In the OmniView Affidavit, Special Agent Braconi described the materially false

and misleading statements issued to the public by CodeSmart that were set forth in the Wiretap

Affidavit, and he also described an additional misleading press release relating to Ramapo

79

College.  (OmniView Aff. ¶ 16).  Also, the OmniView Affidavit discussed how on August 27, 2013, CodeSmart's CEO, Shapiro, announced that he had purchased 25,000 shares of CodeSmart stock from the public market at $3.21 per share for a cost of $80,250 in a SEC Form-8K filing. (OmniView Aff. ¶ 19).  Shapiro stated that his "stock purchase [was] symbolic of [his] confidence in the Company and its mission."  (Id.).  In reality, Shapiro did not pay for the 25,000 CodeSmart shares purchased in his brokerage account.  (Id.).  On September 4, 2013, the same day that Shapiro paid $81,278 from his personal bank account to his brokerage firm for the 25,000 shares of CodeSmart, Discala directed the transfer of $81,278 from Fidelis' bank account to Shapiro's personal bank account.  (Id. ¶ 21).

    Discala claims that OmniView Affidavit fails to "draw any connection between any 'false or misleading press release'" and Discala or the OmniView Premises.  (Discala Mem. at 26).  In addition, Discala states the OmniView Affidavit "fails to establish any role Mr. Discala may have taken in any supposedly false or misleading SEC filings."  (Id.).  Specifically, Discala points to the following allegedly misleading statements and material omissions: (1) There was "no allegation" that Discala was connected to the CodeSmart press releases discussed in paragraphs 12 through 20; (2) Special Agent Braconi omitted to explain that there was supposed to be a "legal firewall" between Discala and CodeSmart regarding press releases; (3) Special Agent Braconi "cherry-pick[ed]" one CodeSmart press release out of 52 to show "any evidence tending to demonstrate that Discala could conceivably have had any communication regarding a press release"; (4) Paragraph 50, which contains quotes from texts between Discala and Wexler regarding a "release," is an illustration of Special Agent Braconi's "mendacious tactics" because no inference of wrongdoing can be connected to Discala; (5) Special Agent Braconi negligently refers to a  July 12, 2013 SEC Form 8-K as a Form 10-K;  (6) Special Agent

Braconi "consistently conflated" projected future revenue and growth, which was "hopeful and contingent," and cash on hand, to "paint the intentionally misleading picture that he did at paragraph 18;" and (7)  Discala claims it was somehow materially misleading for Special Agent Braconi to find significant that Shapiro's CodeSmart stock purchase, announced on August 27, 2013, as "symbolic of his confidence" in CodeSmart was entirely funded by Discala.  (Discala Mem. at 24-28).

In particular, Discala complains that Special Agent Braconi unfairly compared CodeSmart's July 12, 2013 stock price and resulting market capitalization of over $86 million to CodeSmart's July 12, 2013 amended 8-K filing without clarifying that the financial statements were for the period ending March 31, 2013, prior to the period CodeSmart had been "recapitalized."[23]  (See OmniView Aff. ¶ 23).  Discala repeats this claim for Cubed, arguing that Special Agent Braconi unfairly compared the finances of the empty shell company as of February 28, 2014 with the market capitalization of Cubed based on its stock price three to four months later, after the shell acquired the intellectual property asset and received investor funds.  (Discala Mem. at 28; OmniView Aff. ¶ 43).  Discala claims that this comparison was "blatantly irrelevant."  (Discala Mem. at 29).

In sum, Discala appears to be complaining that Special Agent Braconi did not allege that Discala was directly involved in issuing false and misleading press releases and SEC filings, not that Special Agent Braconi asserted anything that was not true.  Discala also argues

---

[23] In CodeSmart's SEC Form 10-Q filed on August 19, 2013 for the period ending June 30, 2013, current assets were reported as $264,994, current liabilities as $1,262,220, and there was a working capital deficit of $997,226.  The net loss for the six months ending June 30, 2013 was $2,907,838.

that Special Agent Braconi's failure to include Discala's factual defenses, like the dubious claim that Discala scrupulously observed a "legal firewall" between himself and CodeSmart and Cubed,[24] and expected Shapiro to pay him back for the CodeSmart stock purchase, were material omissions.  Finally, Discala argues that it was misleading for Special Agent Braconi to argue that the stock prices of CodeSmart and Cubed were vastly overinflated at their peaks by looking at the contemporaneously issued SEC filings, which included historical financial information that was out of date by a few months when issued.  This is what Discala outrageously characterizes as "innuendo, blatant mischaracterization and outright lies."  (Discala Mem. at 29).

However, as explicitly laid out in the OmniView Affidavit, Discala was alleged to be a participant in a stock manipulation conspiracy which involved a number of people who had different roles, including Ira Shapiro, CodeSmart's CEO, who issued a large number of press releases during the stock manipulation scheme and was responsible for the SEC filings.  The OmniView Affidavit noted that CodeSmart issued press releases every three days between May 13, 2013 and July 12, 2013.  (OmniView Aff. ¶ 18).  The OmniView Affidavit also made clear that while Discala did not communicate with Shapiro nearly as often as Wexler, Josephberg, and Bell, there were over 100 calls and texts between the two during a six-month period. (OmniView Aff. ¶ 25).

The evidence gathered also showed Discala had a keen interest in the news issued by the manipulated companies.  (See OmniView Aff. ¶ 52 (Discala told investor, "I got that email, the wonderful thing about the CUBE is some big announcement coming), ¶ 53 (Discala

---

[24] CodeSmart and Cubed were represented by attorneys hand-picked by Discala, Darren Ofsink and Cane.  Cane was indicted with Discala before the OmniView Warrant was signed, and Ofsink was included in the case later in a Superseding Indictment.

"had a great call with [Cane]. She's on the marketing")). In the very fair reading in Paragraph 50 of the OmniView Affidavit, it appears Discala took credit for a press release Cubed issued on April 24, 2014. Furthermore, it appeared that Discala was willing to generate positive news for a company that otherwise had none. (See OmniView Aff. ¶ 54 (Discala told Wexler "So our deal is going to pay the Cube two-fifty, because these guys can't generate revenue, so I'm going to generate it myself.")).

Furthermore, it was not misleading to compare stock prices and the resulting market capitalization with contemporaneously released, but historical, financial data, to argue that the comparison suggested the stock price was grossly overinflated and, therefore, suggestive of fraud. Even if it may have been better to make clear in Paragraph 23 that CodeSmart's amended SEC Form 8-K[25] filing on July 12, 2013 was for financial data for a time period ending months earlier, as it did in paragraph 43 for a Cubed SEC filing, there was certainly no intent to mislead. In sum, there was ample probable cause to believe Discala was involved in the SEC filings and press releases issued by the manipulated companies to further the stock manipulation scheme and that evidence would be found in his office, the OmniView Premises.

b.      Concealment of Ownership Interests

Discala claims that the OmniView Affidavit "does not cite any evidence or make any allegation connecting Discala or OmniView to the supposed concealment of any ownership interests in the four relevant stocks." (Discala Mem. at 29-30). In support of his argument, Discala points to a CodeSmart Shareholder Table. (See Discala Mem., Ex. N). This undated

---

[25] It was simply a drafting error to refer to this form as an amended 10-K on paragraph 23, as it is correctly identified as an amended 8-K in paragraphs 18 and 24 of the OmniView Affidavit.

table, while very interesting and probative of the criminal charges, appears to be an internal OmniView document, and not something that was available to the public.  It also does not match the figures later filed with the SEC.  (See Discala Mem., Ex. I at 19 (listing shares owned by Fidelis and OmniView as of May 9, 2013)).  Of the original 3,000,000 "total free shares", i.e. unrestricted shares of CodeSmart, Exhibit N shows Discala owning 68,750 shares, OmniView owning 362,500 shares, Fidelis owning 238,333 shares, and "Marlene Goepel (Pool)" owing 156,250 shares.  Exhibit N shows Discala, through shares held in his own name, and through OmniView, Fidelis and Goepel, controlling approximately 12% of the shares from the time of the reverse merger.  Special Agent Braconi's Affidavit states, "Discala carried out a substantial portion of the trading in the name of his administrative assistant and in the name of LLCs for which he was the CEO. I believe Discala did this in order to avoid being seen as holding more than five percent of the outstanding shares of CodeSmart and thereby becoming subject to SEC reporting obligations."  (OmniView Aff. ¶ 27).  While the May 3, 2013 8-K does show more than 5% ownership each by Fidelis and OmniView Capital, they are described as having different addresses and the footnotes added in the Amendment, which were not included in the original filing, indicate that the Dounya Discala was the beneficial owner of Fidelis stock and Lucy Ostrovsky, another former OmniView employee, was the beneficial owner of the OmniView stock.  (OmniView Aff., Ex I at 22).  There appears to be no reference to Discala as a control person in the SEC filings.

Furthermore, with respect to Cubed, the OmniView Affidavit describes how Discala and his co-conspirators were placing stock into an "escrow" account controlled by Cane to control the stock price.  (OmniView Aff. ¶¶ 44, 52, 56, 69).  This control clearly was intended to be concealed from the market.  In sum, there were no "sleights of hand" or material omissions

in the OmniView Affidavit regarding Discala's concealment from the market of his control of the CodeSmart and Cubed stock, and there was ample probable cause to believe that evidence of this control would be found at the OmniView Premises.

c.    Trading Losses

Discala claims that, even, assuming arguendo, there is evidence to show that he was involved in coordinating trading of StarStream and the Staffing Group, it was a material omission for Special Agent Braconi to not include in the OmniView Affidavit that Discala suffered investment and trading losses in these stocks.  (Discala Mem. at 31).  Discala's assertion is false.  Special Agent Braconi accurately described Discala's intercepted conversations in the OmniView Affidavit regarding trading in these stocks.  It is clear that Discala was attempting to illegally influence the stock price, and it is not material to the probable cause determination if, overall, specific trades or even the overall scheme did not succeed and result in profits.  In the Affidavit, Special Agent Braconi discussed that the co-conspirators' efforts to control the trading volume was part of the stock manipulation schemes, and that there were multiple days where Discala and Wexler both bought and sold large amounts of CodeSmart stock with no evident economic purpose (other than to generate trading volume and support the stock price). (OmniView Aff. ¶ 26).  Although there is nothing wrong with purchasing, and then quickly selling, stock, as Discala's wife did with Cubed, Special Agent Braconi was pointing out that that much of the trading in Cubed appeared concentrated in the hands of individuals associated with Discala, which supported the government's claim that there was probable cause to believe Cubed's stock was being illegally manipulated by Discala.

d.    Coordination with Bell and Josephberg

Discala also claims that the government failed to establish a sufficient connection between Discala and Josephberg and/or Bell to provide probable cause to search OmniView.

However, as set forth in the OmniView Affidavit, Josephberg and Bell were key players in the scheme and they closely coordinated their activities with Discala.  For example, the government calculated that between May 13, 2013 and May 29, 2013, Wexler, Discala, Discala's administrative assistant and OmniView sold approximately 340,000 CodeSmart shares.  The buyers of these shares were mainly Bell clients, who purchased approximately 205,000 shares of CodeSmart during this time period.  Telephone records show that Discala and Bell were in constant communication.  (OmniView Aff. ¶ 31).  Between August 29, 2013 and September 20, 2013, accounts controlled by Josephberg and his assistant at Halcyon purchased at least 100,000 shares of CodeSmart in customer accounts.  (Id.).  Discala and Josephberg were also in constant contact.  (Id. ¶ 32).

The government calculated that Discala made approximately $3 million by trading CodeSmart stock, including $600,000 in profit in an account held in his assistant's name but controlled by Discala.  In addition, Wexler, also associated with OmniView, made over $2.2 million, Josephberg made approximately $750,000, and Bell made approximately $550,000. (OmniView Aff. ¶ 36).

Discala also disregards the import of the events described in Paragraph 29 of the OmniView Affidavit where Bell's clients, complaining about Bell persuading them to purchase CodeSmart, were offered heavily discounted CodeSmart stock by Bell pursuant to a stock purchase agreement from Fidelis and signed by Discala, after Bell and Discala texted over 255 times in the three days prior to the meeting.  (Discala Mem. at 16).  Discala argues that finding this text activity notable was a "particularly misleading example of Special Agent Braconi's overreach," since Bell and Discala "on average exchanged 42 texts per day," between May 1, 2013 and October 31, 2013, so this was "within the normal bounds of communication."  (Discala

86

Mem. at 32-33). In fact, there was nothing "normal" about the communications between Discala and Bell or between Discala and Josephberg. The evidence showed they were in constant communication to coordinate trading activity for their mutual financial benefit, at the expense of Bell's and Josephberg's clients. For example, on April 2, 2014, Bell texted Discala, "I got buyers in the market in California for cube. Do u know when it is live to buy[?]" Discala responded, "Waiting with baited breathe[.]" (OmniView Aff. ¶ 45). On April 17, 2014, Bell texted, "Any idea on cube trading. I'm bidding 5.25." Discala later responded, "Tell them to bid size." (OmniView Aff. ¶ 47). Later that same day, Discala texted, "Bids please." Bell, "What price," Discala, "527," Bell, "Ok." (OmniView Aff. ¶ 48; see also OmniView Aff. ¶ 64 (Discala directing Bell to purchase Staffing Group stock at ".20 or better")). Discala similarly directed Josephberg to place his clients in Cubed to create volume. (See OmniView Aff. ¶¶ 55, 59). In summary, Bell and Josephberg were important participants in Discala's stock manipulation schemes.

e.   Connection to the OmniView Premises

In his motion, Discala argues that the facts laid out in the OmniView Affidavit are not sufficiently connected to the OmniView Premises to provide probable cause to search that location. (Discala Mem. at 31). That is simply not correct. Discala was the central figure in the stock manipulation scheme, he was OmniView's CEO, and OmniView's principal place of business was the OmniView Premises. (OmniView Aff. ¶ 68). On May 20, 2014, Discala told a potential investor that he usually worked in Connecticut. (Id.). Documents relating to the manipulated stocks were generated, sent or received from OmniView, by email or other means. (Id. ¶ 69). For example, Discala told certain investors that they would have to sign a participation agreement to participate in the escrow accounts that held Cubed stock. These documents were being sent and received by email by individuals associated with OmniView,

87

including Discala, Wexler, Dounya Discala (Discala's wife), who is listed as part of the OmniView management team on OmniView's website and Discala's administrative assistants. Bell told Discala that he would send Discala, by Federal Express, money for Cubed, with the check made out to OmniView.  (Id. ¶ 46).  Furthermore, OmniView was the primary business vehicle that Discala used to execute the charged stock manipulation scheme.  Stock was held in OmniView's name, OmniView had trading accounts, and OmniView's entire line of business was doing for companies what it did for CodeSmart and Cubed.

Accordingly, there was overwhelming probable cause to authorize the search of OmniView.  Furthermore, there is no showing that Special Agent Braconi lied or misrepresented the facts in the OmniView Affidavit, let alone the substantial showing required for a Franks hearing.  In sum, the OmniView Affidavit fairly and accurately presents the facts, and the Court should swiftly dismiss Discala's irresponsible accusations of deception and falsehood.

### 2.      The OmniView Warrant Satisfies the Particularity Requirement

The OmniView Warrant was sufficiently particularized and not over broad, in light of the probable cause supporting the search.  Often, warrants are framed as permitting seizure of any and all evidence of specified crimes, "including but not limited to" illustrative categories of documents and records.  As noted above, courts routinely uphold such warrants against particularity challenges, notwithstanding the apparent blanket permission to seize "all evidence," reasoning that the illustrative list, coupled with the reference to the crimes of which evidence is sought, supplies sufficiently limiting guidance.  See, e.g., Riley, 906 F.2d at 843-45; Young, 745 F.2d at 759-60; Lustyik, 57 F. Supp. 3d at 227-28 (warrant permitting seizure of all "evidence, fruits, or instrumentalities" of specified crimes was sufficiently particular because it contained "an illustrative list of items to be seized," even though illustrative list was preceded by

phrase "including but not limited to"); Jacobson, 4 F. Supp. 2d at 524 (upholding warrant for "[a]ny and all records, data and correspondence constituting evidence, fruits and instrumentalities of" specified crimes, "in any form wherever that they may be stored or found including, but not limited to" specified categories); cf. Buck, 813 F.2d at 591 (warrant that permitted seizure of "any papers, things or property of any kind relating to" specified crime was insufficiently particular because unaccompanied by an illustrative list).

Here, there was a strong basis for a finding that OmniView was permeated by fraud in light of all the evidence gathered to date, and little indication that it was engaged in legitimate business untainted by Discala's fraudulent activities.  See D'Amico, 734 F. Supp. 2d at 361 (applying all records doctrine where government acknowledged subject business engaged in some legitimate activity).

Finally, there is no basis for the claim that the agents seized "every document," in the OmniView office.  The agents seized a total of six boxes of documents and nine electronic items later imaged off-site.  The subsequent handling of the imaged items was done by search terms after consultation between the prosecutors and defense counsel.

3.    The Good Faith Exception

Even if the Warrants were either insufficiently particularized or overbroad, the good faith doctrine would apply to preclude suppression.

The OmniView Affidavit was detailed and robust, and the search warrant was executed after Discala's telephone had been intercepted pursuant to a wiretap and Discala had been indicted.  An agent would reasonably have believed that probable cause supported seizure of the documents and records described in the OmniView Warrant.  See, e.g., Clark, 638 F.3d at 103 (cases involving a "defective warrant issued based on an affidavit providing detailed factual

89

allegations in support of probable cause" "almost invariably demonstrate reasonable reliance");
Feng Ling Liu, 2014 WL 101672, at *8-9 (even if "all records" warrant might have been
overbroad, agents reasonably relied on broad statement of probable cause in concluding such a
warrant was appropriate); Levy, 2013 WL 664712, at *10 ("Given the nature of the complex
financial crimes and conspiracy alleged, executing officers would reasonably expect to find
fairly broad categories of financial documents to be seized."); Bowen, 689 F. Supp. 2d at 684
(applying good faith exception in alternative to finding that "all records" doctrine applied);
Hernandez, 2010 WL 26544, at *12 (where case was one involving complex fraud, "a
government agent would likely expect to find fairly broad categories" of documents to be seized
described in the warrant).  This was not a case in which any problem with particularization or
probable cause to search and seize documents, including OmniView's computers and servers,
would have been apparent to a reasonable agent.

*       *       *

The foregoing facts foreclose a finding of deliberate, culpable conduct on the
agents' part.  Even if one could find fault with the agents' conduct in this case – and the
government submits that one cannot – any such conduct plainly was not "sufficiently deliberate
that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth
the price paid by the justice system."  Herring, 555 U.S. at 144; Rosa, 626 F.3d at 64, 66
(suppression unwarranted absent evidence of deliberate and culpable behavior by law
enforcement agents).  The warrant at issue here was particularized and amply supported in every
way by the probable cause articulated in the affidavit underlying it.  If there were any doubt on
this score, the good faith doctrine would preclude suppression.

90

## <u>CONCLUSION</u>

For the reasons set forth herein, the defendants' motions to dismiss, to sever, for a jury questionnaire and to suppress evidence obtained pursuant to a wiretap and a search warrant should be denied without a hearing.

Dated:     Brooklyn, New York
           November 17, 2017

                                        Respectfully submitted,


                                        BRIDGET M. ROHDE
                                        ACTING UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        Attorney for Plaintiff
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201


                        By:      /s/ Shannon C. Jones
                                 Shannon C. Jones
                                 Patrick T. Hein
                                 Mark E. Bini
                                 Assistant United States Attorneys
                                 (718) 254-7000