WK:SCJ/PH/MEB/CK
F. #2013R01203

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   JUN 27 2018   ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

MICHAEL MORRIS,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

**S U P E R S E D I N G
I N D I C T M E N T**

Cr. No. <u>14-399 (S-2) (ENV)</u>
(T. 15, U.S.C., §§ 78j(b) and 78ff;
T. 18, U.S.C., §§ 371, 981(a)(1)(C),
1349, 1512(c)(2), 2 and 3551 <u>et
seq.</u>; T. 21, U.S.C., § 853(p); T. 28,
U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

      At all times relevant to this Superseding Indictment, unless otherwise indicated:

I.    <u>The Defendant and Relevant Individuals and Entities</u>

        1.    The defendant MICHAEL MORRIS, a resident of Merrick, New York, was a registered broker. MORRIS was a Managing Director of Halcyon Cabot Partners, Ltd. ("Halcyon"), a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, with its principal place of business in New York, New York. MORRIS also served for a period of time as the Chief Compliance Officer of Halcyon. MORRIS owned half of Halcyon through a company held in his wife's name.

        2.    Craig Josephberg, a resident of New York, New York, was a registered broker. In or about and between November 2010 and October 2013, Josephberg was employed as a broker by Halcyon at its office in New York, New York. Josephberg also controlled Garper

1

LLC ("Garper"), a Delaware limited liability company with its principal place of business in New York, New York.

3.    Abraxas J. Discala, also known as "AJ Discala," a resident of Rowayton, Connecticut, was the Chief Executive Officer ("CEO") of OmniView Capital Advisors LLC ("OmniView").  Discala also controlled Fidelis Holdings, LLC ("Fidelis").

4.    Marc Wexler, a resident of Colts Neck, New Jersey, was a Managing Director of OmniView.

5.    Matthew Bell, a resident of Helotes, Texas, was a registered broker and investment adviser representative.

6.    Ira Shapiro, a resident of Congers, New York, was the CEO and Chairman of the Board of CodeSmart Holdings, Inc. ("CodeSmart"), formerly First Independence Corp. ("First Independence"), from approximately May 2013 until July 2014.

7.    CodeSmart, formerly First Independence, was a Florida corporation with its principal place of business in New York, New York.  CodeSmart traded under the ticker symbol ITEN.  CodeSmart's purported business plan consisted of furnishing the healthcare industry with educated, trained and qualified "ICD-10" certified coders.  ICD-10 was the medical coding system mandated by the Centers for Medicare and Medicaid Services as part of the Patient Protection and Affordable Care Act of 2010.  CodeSmart offered "CodeSmart University" as "an online program of study for existing coders, new coders, clinicians and healthcare roles of all types."

II.    Relevant Regulatory Principles and Definitions

8.    The term "beneficial owner" was defined under the rules of the SEC.  It included any person who directly or indirectly shared voting power or investment power (the

power to sell a security).  When a person or group of persons acquired beneficial ownership of

more than five percent of a voting class of a company's equity securities registered under Section

12 of the Securities Exchange Act of 1934, they were required to file a Schedule 13D with the

SEC.  Schedule 13D reported the acquisition and other information within 10 days after the

purchase. The schedule was filed with the SEC and was provided to the company that issued the

securities and each exchange on which the security was traded.  Any material changes in the

facts contained in the schedule required a prompt amendment.

9.      The term "nominee" in the securities fraud context referred to a person or

firm into whose name securities or other properties were transferred to facilitate transactions,

while concealing the customer as the actual owner.  A "nominee account" was a type of account

in which a stockbroker held shares belonging to clients in the name of a sham entity or another

individual.  The use of nominees and nominee accounts was designed to conceal the true

ownership interest of the customer.

10.      "Microcap" or "penny" stocks referred to stocks of publicly traded U.S.

companies that had a low market capitalization.  Microcap stocks were often subject to price

manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks

that traded on notable exchanges.  Additionally, large blocks of microcap stock were often

controlled by a small group of individuals, which enabled those in the group to control or

orchestrate manipulative trading in those stocks.

11.      A "pump and dump" scheme was a scheme where a group of individuals

who controlled the free trading or allegedly unrestricted shares, also referred to as the "float," of

a microcap public company fraudulently inflated the share price and trading volume of the

targeted company's stock through, inter alia, wash and matched trades, false and misleading

3

press releases and paid stock promotions.  When the target company's share price reached
desirable levels, the individuals sold their free trading shares for substantial financial gain.

12.     Wash trades were purchases and sales of securities that matched each
other in price, volume and time of execution, and involved no change in beneficial ownership.
For example, a wash trade took place when Investor A bought 100 shares at $5.00 per share of
Company A through Broker A while simultaneously selling 100 shares at $5.00 per share of
Company A through Broker B.  Matched trades were similar to wash trades but involved a
related third person or party who placed one side of the trade.  For example, a matched trade took
place when Investor A bought 100 shares at $5.00 per share of Company A through a broker,
while Investor B, who coordinated with Investor A, simultaneously sold 100 shares at $5.00 per
share of Company A through a broker.  Both wash trades and matched trades were used to create
the appearance that the stock price and trading volume rose as a result of genuine market demand
for the securities.

III.     The CodeSmart Market Manipulation Scheme

13.     In or about and between October 2012 and July 2014, the defendant
MICHAEL MORRIS, together with others, agreed to defraud investors and potential investors in
CodeSmart by artificially controlling the price and trading volume of CodeSmart shares through,
inter alia: (a) false and misleading press releases; (b) false and misleading SEC filings;
(c) fraudulent concealment of the co-conspirators' beneficial ownership of CodeSmart shares;
(d) engineering price movements and trading volume of CodeSmart stock; and (e) unauthorized
purchases of CodeSmart stock in accounts of unwitting investors.

4

A.    Control of the Purportedly Unrestricted Stock

14.    In approximately April 2012, First Independence filed a Form S-1 with the SEC to register an offering of 3,000,000 shares of its stock, which was made effective on August 7, 2012. In or about January 2013, despite projecting an extremely pessimistic outlook in prior SEC filings, First Independence sold its entire lot of 3,000,000 shares to 24 shareholders, based primarily in Florida, for $0.0115 per share, raising $34,500 for the company. The 3,000,000 shares were registered with First Independence's transfer agent on or about February 7, 2013. The Form S-1 did not authorize any subsequent distribution of those shares to others or to the general public.

15.    From approximately February 2013 through April 2013, there was no public trading of First Independence stock. On or about May 3, 2013, CodeSmart, a private company, was acquired by First Independence, a shell public company, in a reverse merger. Following the reverse merger, the new company operated under the name CodeSmart.

16.    In or about May 2013, the defendant MICHAEL MORRIS, along with Abraxas J. Discala, Marc Wexler, Craig Josephberg and Matthew Bell (collectively, the "Co-Conspirators"), together with others, purchased the 3,000,000 purportedly unrestricted shares of CodeSmart at $0.023 per share from the aforementioned 24 shareholders. MORRIS and the Co-Conspirators concealed their beneficial ownership interest in the 3,000,000 shares by distributing the shares across a number of co-conspirators and by placing them in nominee accounts designed to conceal the true beneficial owners of the shares. On or about June 14, 2013, CodeSmart implemented a 2-for-1 forward stock split of its common stock, which caused the 3,000,000 shares controlled by MORRIS and the Co-Conspirators to double to 6,000,000 shares.

B.    The Pump and Dump Schemes

17.    After gaining control of CodeSmart's purportedly unrestricted shares, the

defendant MICHAEL MORRIS and the Co-Conspirators engaged in two separate pump and

dump schemes. The first pump and dump scheme occurred between approximately May 13,

2013 and August 21, 2013. During this first period, MORRIS and the Co-Conspirators

manipulated CodeSmart's stock price by raising it from $1.77 per share to a high of $6.94 per

share, before causing it to drop to $2.19 per share. The second pump and dump scheme occurred

between approximately August 21, 2013 and September 20, 2013. During this second period,

MORRIS and the Co-Conspirators manipulated CodeSmart's stock price by raising it from $2.19

per share to a high of $4.60 per share, before causing it to drop to $2.13 per share.

18.    CodeSmart's market capitalization at its highest closing price of $6.94 per

share on or about July 12, 2013 was $86,347,800. That same day, however, CodeSmart filed

with the SEC an amended Form 10-K, signed by Ira Shapiro, CodeSmart's CEO, in which

CodeSmart listed only $6,000 in total assets, $7,600 in revenue and a net loss of $103,141. By

approximately December 30, 2013, after both pump and dump schemes, CodeSmart's stock was

trading at $0.66 per share, and on or about July 9, 2014, CodeSmart's stock closed at $0.01 per

share.

19.    In furtherance of the CodeSmart stock manipulation scheme, the defendant

MICHAEL MORRIS and the Co-Conspirators coordinated their trading activity with the

issuance of company press releases, a number of which contained false and misleading

information. These press releases, which touted agreements between CodeSmart and various

universities and learning institutions, were issued at an accelerated rate in an effort to generate

market interest in the stock. For example, on or about May 28, 2013, CodeSmart issued a press

6

release that stated, in part, that "its CodeSmart University product is the exclusive strategic partner for ICD-10 education and consulting services to Binghamton University, part of the State University of New York ('SUNY') system, which will exclusively market and provide CodeSmart University products to their students in the School for Continuing Education." Contrary to this representation, CodeSmart was not the "exclusive strategic partner" for ICD-10 education courses at Binghamton University because Binghamton University also offered courses through other providers and had no plans to market exclusively CodeSmart University to its students. Upon issuance of this press release, on or about May 28, 2013, the trading volume of CodeSmart's shares surged to 316,000 trades that day, compared to 122,400 trades the trading day before the press release.

20. During the first pump and dump period, the defendant MICHAEL MORRIS and the Co-Conspirators filed and caused to be filed with the SEC forms that contained material misrepresentations and omissions, including unrealistic and unattainable revenue forecasts. For example, on or about July 12, 2013, the day CodeSmart's stock closed at its highest share price of $6.94 per share, CodeSmart filed with the SEC an amended Form 8-K, signed by Ira Shapiro, in which CodeSmart estimated "about $10 million in revenues over the following 12 months from the date of this Report." On or about August 19, 2013, approximately one month later and the day CodeSmart's stock price had dropped dramatically to $2.50 per share, CodeSmart filed with the SEC a Form 10-Q, signed by Shapiro, which stated that the company did "not have sufficient funds to fully implement [its] business plan," and that, if they did not obtain the funds, CodeSmart "may need to curtail or cease [its] operations until such time as [it has] sufficient funds."

7

21.     During the second pump and dump period, the defendant MICHAEL

MORRIS and the Co-Conspirators again filed and caused to be filed with the SEC forms that

contained material misrepresentations and omissions.  For example, on or about August 26,

2013, at a time when CodeSmart's stock price was rising and closed at $3.10 per share,

CodeSmart filed with the SEC a Form 8-K, signed by Ira Shapiro, in which Shapiro stated, "If

we continue on the track we are on, I believe we will achieve our revenue and profit goals that

were previously disclosed for 2013 and beyond."  The next day, on or about August 27, 2013,

CodeSmart filed with the SEC a Form 8-K, signed by Shapiro, in which CodeSmart announced

that Shapiro had purchased 25,000 shares of the company's stock from the public market at the

market value of $3.21 per share for a total cost of $80,250.  In this SEC filing, Shapiro extolled

his purchase of CodeSmart stock and stated that his "stock purchase [was] symbolic of [his]

confidence in the Company and its mission."  In reality, Shapiro did not pay for the 25,000

CodeSmart shares purchased in his brokerage account at Halcyon.  On or about September 4,

2013, the same day that Shapiro paid $81,278 from his personal bank account to Halcyon's

clearing firm for the 25,000 shares of CodeSmart, Abraxas J. Discala directed the transfer of

$81,278 from Fidelis's bank account, which Discala controlled, to Shapiro's personal bank

account.

22.     Additionally, during the second pump and dump period, the defendant

MICHAEL MORRIS and the Co-Conspirators fraudulently engineered price movements and

trading volume in CodeSmart stock through, inter alia, wash trades and matched trades.  For

example, on or about August 21, 2013, in order to reap profits from the increase in CodeSmart's

share price during the second pump and dump scheme, MORRIS and the Co-Conspirators sold

approximately 140,000 shares from a trading account at Halcyon controlled by Abraxas J.

8

Discala, but held in the name of Marlene Goepel, Discala's administrative assistant. Because there was no genuine market demand to purchase 140,000 CodeSmart shares at this time, Discala directed MORRIS, Craig Josephberg and other co-conspirators to purchase the CodeSmart shares. Approximately half of the 140,000 CodeSmart shares sold that day were purchased by MORRIS, using his Halcyon brokerage account, by Josephberg, using a brokerage account held by Garper at another broker-dealer, and by other co-conspirators and individuals affiliated with the Co-Conspirators.

C.    Profits at Investors' Expense

23.    The defendant MICHAEL MORRIS and the Co-Conspirators ultimately profited by selling CodeSmart stock, issued to them at pennies, to Halcyon customers and clients of Matthew Bell. On some occasions, MORRIS and the Co-Conspirators sold CodeSmart shares to customers at Halcyon and Bell's clients without the customers' and clients' knowledge and consent and without providing them with required disclosures.

24.    At the same time that Craig Josephberg and others were purchasing CodeSmart stock in Halcyon's customers' brokerage accounts, the defendant MICHAEL MORRIS was selling CodeSmart stock in his son's brokerage accounts and sharing in the profit from those sales. Specifically, in or about and between May 2013 and October 2013, Halcyon's customers purchased approximately 130,000 shares of CodeSmart. During this same period, MORRIS sold approximately 62,500 shares of CodeSmart stock in his son's brokerage accounts.

25.    Additionally, on or about and between May 13, 2013 and August 7, 2013, the defendant MICHAEL MORRIS and the Co-Conspirators sold approximately 859,226 shares of CodeSmart in brokerage accounts they controlled while Craig Josephberg and Matthew Bell purchased 813,577 shares of CodeSmart in their customers' and clients' brokerage accounts.

9

26.     The defendant MICHAEL MORRIS and the Co-Conspirators profited through their fraudulent manipulation of CodeSmart stock.  MORRIS obtained over $420,000 in proceeds from the sale of CodeSmart stock held in his and his son's names.  In addition, Halcyon reaped approximately $300,000 in commissions from trading in CodeSmart stock.

III.     Obstruction of Justice

27.     On or about July 17, 2014, an indictment was unsealed in this matter against the Co-Conspirators, including Abraxas J. Discala, Craig Josephberg, Ira Shapiro and Matthew Bell, and the SEC filed a civil lawsuit in the United States District Court for the Eastern District of New York, entitled Securities and Exchange Commission v. Discala et al., Civ. No. 14-4346 (ENV), naming Abraxas J. Discala, Marc Wexler, Matthew Bell and Craig Josephberg as defendants and alleging that they participated in a scheme to manipulate the stock of several companies, including CodeSmart.

28.     On or about February 27, 2015, officers of the SEC took the sworn testimony of the defendant MICHAEL MORRIS in connection with the SEC's continuing investigation into violations of securities laws and regulations with respect to CodeSmart. During that proceeding, MORRIS made false statements to the SEC in an effort to obstruct, influence and impede the SEC's investigation.  For example, MORRIS falsely stated that he purchased CodeSmart stock on August 21, 2013, solely because the stock looked like a good value, and denied that he had discussed said purchase with Abraxas J. Discala, when, in fact, MORRIS purchased CodeSmart stock at Discala's request to help prevent the stock price from declining too severely upon Discala's anticipated sale of CodeSmart shares from accounts Discala controlled.

## COUNT ONE
(Conspiracy to Commit Securities Fraud)

29.     The allegations contained in paragraphs one through 28 are realleged and incorporated as if fully set forth in this paragraph.

30.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL MORRIS, together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in CodeSmart, in connection with the purchase and sale of investments in CodeSmart, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

31.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant MICHAEL MORRIS, together with others, committed and caused to be committed, among others, the following:

OVERT ACTS

(a)     On or about May 1, 2013, MORRIS purchased 31,250 shares of CodeSmart stock by writing a check for $719 to an original CodeSmart shareholder and writing a separate check to OmniView for $49,281.

(b)     On or about August 21, 2013, MORRIS purchased 12,500 shares of CodeSmart stock at $2.29 per share for a cost of $28,709.

(c)     On or about August 27, 2013, Ira Shapiro filed with the SEC a Form 8-K on behalf of CodeSmart, which reported that Shapiro had purchased, from the public market, 25,000 shares of CodeSmart stock at the market value of $3.21 per share for a cost of $80,250.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

COUNT TWO
(Conspiracy to Commit Mail Fraud and Wire Fraud)

32.     The allegations contained in paragraphs one through 28 are realleged and incorporated as if fully set forth in this paragraph.

33.     In or about and between October 2012 and July 2014, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL MORRIS, together with others, did knowingly and intentionally conspire:

(a)     to devise a scheme and artifice to defraud one or more investors and potential investors in CodeSmart, and to obtain money and property from them by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to cause to be delivered one or more matters and things by

12

FedEx Corp. and other private and commercial interstate carriers according to the direction

thereon, contrary to Title 18, United States Code, Section 1341; and

> (b)     to devise a scheme and artifice to defraud one or more investors

and potential investors in CodeSmart, and to obtain money and property from them by means of

materially false and fraudulent pretenses, representations and promises, and for the purpose of

executing such scheme and artifice, to transmit and cause to be transmitted by means of wire

communication in interstate and foreign commerce writings, signs, signals, pictures and sounds,

contrary to Title 18, United States Code, Section 1343.

> (Title 18, United States Code, Sections 1349 and 3551 et seq.)

### COUNT THREE
### (Securities Fraud)

34.     The allegations contained in paragraphs one through 28 are realleged and

incorporated as if fully set forth in this paragraph.

35.     In or about and between October 2012 and July 2014, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant

MICHAEL MORRIS, together with others, did knowingly and willfully use and employ one or

more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules

and Regulations of the United States Securities and Exchange Commission, Title 17, Code of

Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and

artifices to defraud; (b) making one or more untrue statements of material fact and omitting to

state one or more material facts necessary in order to make the statements made, in the light of

the circumstances in which they were made, not misleading; and (c) engaging in one or more

acts, practices and courses of business which would and did operate as a fraud and deceit upon

one or more investors and potential investors in CodeSmart, in connection with the purchase and sale of investments in CodeSmart, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT FOUR
### (Obstruction of Justice)

36.     The allegations contained in paragraphs one through 28 are realleged and incorporated as if fully set forth in this paragraph.

37.     On or about February 27, 2015, within the Eastern District of New York and elsewhere, the defendant MICHAEL MORRIS, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede, and attempt to obstruct, influence and impede, an official proceeding pending in the Eastern District of New York, to wit: a civil lawsuit in the United States District Court for the Eastern District of New York entitled Securities and Exchange Commission v. Discala et al., Civ. No. 14-4346 (ENV).

(Title 18, United States Code, Sections 1512(c)(2), 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION AS TO COUNTS ONE THROUGH FOUR

38.     The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged in Counts One through Four, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

14

39.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

        (Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

        A TRUE BILL

        _____
        FOREPERSON

_____
RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. O.136

15

F. # 2013R01203
FORM DBD-34
JUN. 85

No. 14 CR 399 (S-2) (ENV)

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

*MICHAEL MORRIS,*

Defendant.

# SUPERSEDING INDICTMENT

(T. 15, U.S.C., §§ 78j(b) and 78ff;
T. 18, U.S.C., §§ 371, 981(a)(1)(C), 1349, 1512(c)(2), 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

*Shannon C. Jones, Assistant U.S. Attorney (718) 254-6379*